# Illinois Official Reports

## Appellate Court

---

### *People v. Hood*, 2019 IL App (1st) 162194

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK HOOD, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-16-2194 |
| Filed<br>Rehearing denied | December 31, 2019<br>February 6, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-22057; the Hon. James M. Obbish, Judge, presiding. |
| Judgment | Affirmed and remanded as to fines, fees, and costs. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Aliza R. Kaliski, of State Appellate Defender's Office, and Scott F. Main, of DePaul University Legal Clinic, both of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court, with opinion.
Justice Pierce concurred in the judgment and opinion.
Justice Walker dissented, with opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Patrick Hood was convicted of aggravated unlawful use or possession of a weapon (AUUW) without a valid Firearm Owner's Identification (FOID) Card or concealed carry license (CCL) (720 ILCS 5/24-1.6(a)(1) (West 2014)) and sentenced to eight years' imprisonment. On appeal, defendant contends the trial court erred by denying his pretrial motion to quash arrest and suppress evidence because police lacked reasonable suspicion to justify a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). He also challenges various monetary fines and fees assessed by the court. For the following reasons, we affirm the judgment of the circuit court of Cook County and remand as to the fines, fees, and costs order.

¶ 2                                  I. BACKGROUND

¶ 3    Defendant was charged with violating the armed habitual criminal statute (count I), unlawful use or possession of a weapon by a felon (UUWF) (counts II, III, IV, and V), and AUUW (counts VI, VII, VIII, IX, X, and XI), stemming from his December 4, 2014, possession of a handgun while he was seated inside his vehicle. Prior to trial, defendant moved to suppress evidence of the gun, arguing that police lacked probable cause to search his car and seize the gun because he was not violating any laws at the time of the search. He also argued that his "arrest, search, and seizure" were made in violation of his fourth amendment rights.

¶ 4                              A. Suppression Hearing

¶ 5                         1. *Testimony of Officer Nick Beckman*

¶ 6    At the suppression hearing, Chicago police officer Nick Beckman testified that, on December 4, 2014, at around 6:30 a.m., he was seated in the front seat of an unmarked police car with "municipal plates," driving westbound in the vicinity of the 3900 block of West Grenshaw Street, a one-way eastbound street. Officer Beckman described the area as "a very high narcotic area." The sun was not out yet, but streetlights were on. Officer Beckman was wearing plain clothes and a vest with his flashlight attached. As the officers were driving, Officer Beckman noticed defendant sitting in the driver's seat of a Pontiac Bonneville, which was parked facing eastbound on Grenshaw. Inside the Bonneville were also a woman, later identified as Quenisha Mason, who was seated in the front passenger seat, and a man, later identified as Michael Neal, who was seated in the rear passenger seat. Officer Beckman could not recall whether the dome light was on in the car. A man, later identified as Marcus Steward, was standing outside of defendant's vehicle holding money. Officer Beckman's partner, Officer Matthew Gallagher, stopped the police car facing defendant's car, approximately 15 to 25 feet away. At that time, Officer Beckman saw Steward look at the police car then quickly place the money he was holding into his pocket. Officer Beckman also saw defendant "making

movements towards the bottom of his seat while he was seated." It appeared to Officer Beckman that defendant was retrieving something from the floorboard.

¶ 7　　Defendant's behavior was "suspicious" to Officer Beckman, so he quickly exited the police car and "jogged" to defendant's car because "there was an officer safety issue at that point." As he approached, Officer Beckman illuminated the driver's side of defendant's car with his flashlight and observed defendant placing a two-toned handgun into a plastic bag. Defendant then tossed the bag to the rear of his car. Upon seeing defendant toss the bag, Officer Beckman quickly opened the driver's side door and "took hold" of defendant. Officer Clarke briefly detained defendant while Officer Gallagher recovered the bag containing the gun from the backseat of the car. The gun, a two-tone Smith and Wesson, loaded with 11 live rounds, was the same gun that Officer Beckman had observed defendant holding in his lap.

¶ 8　　Officer Beckman acknowledged that he did not witness any illegal transactions occur. He further acknowledged he did not have an arrest warrant or search warrant for defendant or his car. The incident, from the time Officer Gallagher stopped the car until Officer Beckman approached defendant's window, took "seconds."

## 2. *Testimony of Marcus Steward*

¶ 9

¶ 10　　Marcus Steward testified that, on the day in question, he was getting off work and had received a call from defendant. They were "meeting up" to discuss what they were going to do that day. He had known defendant for several years from their neighborhood. Defendant was in his car and Steward was standing outside the passenger side. As he was speaking with defendant, the police arrived. The officers drove the wrong way on Grenshaw, a one-way street. Steward knew they were officers when they exited their car. The officers approached the driver's side of defendant's car and pulled defendant and the other occupants out of the car. Steward denied seeing defendant with a gun or throwing anything into the back seat.

¶ 11　　Steward could not recall whether he had money in his hand. He denied that the police used a flashlight. Although he was standing nearby when the police went into defendant's car, he did not see them remove a gun. He testified he did not pay attention to the police. Steward acknowledged he had a prior conviction for possession of a controlled substance.

## 3. *Ruling on the Motion to Suppress*

¶ 12

¶ 13　　Following arguments, the court denied defendant's motion to quash arrest and suppress evidence. In denying the motion, the court recounted the evidence, noting that the officers were driving the wrong direction on Grenshaw prior to observing defendant's car. The court found Officer Beckman credible and Steward's credibility "strained." The court concluded:

> "In any event, the officer that was credible that I believe actually saw the gun in [defendant's] hand as he approached the car, I believe seeing [defendant] attempting to conceal the gun and get rid of it from his own possession as best he could, I believe had probable cause to then recover the gun."

¶ 14　　Following the denial of his motion to suppress, defendant filed a motion to reconsider, arguing that the mere presence of a gun is not a crime, and therefore, its warrantless seizure was not supported by probable cause. Defendant emphasized that there was no evidence presented regarding whether he had a valid Firearm Owner's Identification Card or concealed carry license at the time of his seizure. The case proceeded to a joint hearing on defendant's

motion to reconsider and bench trial.

## B. Joint Hearing and Bench Trial

### 1. *Testimony of Officer Beckman*

Officer Beckman's testimony at trial was substantially the same as his testimony at the suppression hearing. He added that, on the relevant date, he was working with Chicago police officers Gallagher, Clarke, and Urbanski. All four officers were driving in the same unmarked car. When they stopped in front of defendant's car, defendant was making "quick, furtive movements toward what appeared to be the floorboard area as [if] he was retrieving something." After Officer Beckman approached defendant's side of the car, he saw defendant toss the bag containing the gun. Clarke assisted Officer Beckman in detaining defendant. Officer Beckman then alerted the other officers that "there was a gun thrown." The officers subsequently ordered the other two passengers, Mason and Neal, out of the car. They were briefly detained for investigation. Officer Beckman directed Officer Gallagher to the black plastic bag, which Officer Gallagher recovered from the back seat. The bag contained the gun. Only seconds elapsed between Officer Beckman seeing defendant place the gun in the bag and toss it, and when Officer Gallagher recovered the gun.

On cross-examination, Officer Beckman testified that, initially, his attention was caught by Steward holding money and then quickly placing it in his pocket and defendant's furtive movements. Officer Beckman thought defendant was possibly armed based on his movements, although he could not recall whether he noted that in defendant's arrest report. He believed he wrote in the report that there was an officer safety issue "at some point." He acknowledged that he wrote in the report that he approached defendant's car for a field interview. Officer Beckman clarified he approached the car for a field interview because he was in a high narcotics area and deemed the activity he saw to be suspicious.

Officer Beckman further acknowledged that, when he initially observed defendant with the gun, he did not know whether defendant had a valid Firearm Owner's Identification Card or concealed carry license. After the gun was recovered, Officer Beckman asked defendant whether he had a concealed carry license, and defendant responded "no." He did not give defendant *Miranda* warnings prior to asking whether defendant had a concealed carry license. At the time Officer Beckman asked about the concealed carry license, defendant was in custody and not free to leave.

### 2. *Testimony of Officer Matthew Gallagher*

Officer Matthew Gallagher testified that he stopped the squad car and approached the passenger side of defendant's vehicle, while Clarke and Officer Beckman approached the driver's side. At some point, Officer Beckman told Officer Gallagher there was a "143 Adam," which is a police term for a weapons violation. After receiving the code about the gun, Officer Gallagher ordered Neal out of the rear passenger seat. Officer Gallagher subsequently found a black plastic bag containing a Smith and Wesson handgun with 11 live rounds, including a round in the chamber. There were no other items in the back seat of the car. Officer Gallagher kept the gun in his constant care, custody, and control until returning to the police station, where he gave the gun to Clarke to inventory.

¶ 22    At the police station, about 6:55 a.m. that day, Officer Gallagher, in the presence of Clark, advised defendant of his *Miranda* rights. Defendant verbally indicated he understood his rights and agreed to speak with the officers. He told Officer Gallagher that he received the gun from his cousin. Defendant's cousin instructed him to sell the gun for $700, keep $400 for himself, and give $300 back to his cousin. Defendant also stated that he was a rapper and people knew that "he was making bread," which Officer Gallagher understood meant "money."

¶ 23    On cross-examination, Officer Gallagher testified he did not remember defendant's car having tinted windows. He did not know whether defendant had a valid Firearm Owner's Identification Card or concealed carry license at the time he retrieved the gun from defendant's car. Officer Gallagher also did not know whether defendant was involved in any criminal activity aside from him having the gun. Officer Gallagher acknowledged that he did not have defendant sign a *Miranda* advisory form and did not memorialize the interview. Officer Gallagher did not "run" defendant's cousin's name to track down where the gun came from. He did not recall to whom the gun was registered but remembered that it had been stolen from Indiana.

¶ 24    The State thereafter introduced into evidence two certified copies of defendant's prior convictions for possession of a controlled substance and manufacture and delivery of a controlled substance. The State also introduced a certified document from the office of the Secretary of State showing the Pontiac Bonneville was registered to defendant. The parties stipulated that defendant did not have a valid Firearm Owner's Identification Card or concealed carry license on December 4, 2014.

¶ 25                               3. *Testimony of Defendant*

¶ 26    Defendant testified that, on December 4, 2014, he was going to pick up Mason, his girlfriend, to take her to work. Neal was in the rear passenger seat of his car. While they waited outside Mason's house, Steward was "pulling up" two houses down with his girlfriend. Steward stood outside the passenger side of defendant's car and spoke with defendant. Eventually, Mason came outside and sat in the front passenger seat. Shortly thereafter, the police drove up. Prior to their arrival, Steward had started walking away from defendant's car. However, the police stopped their car in the middle of the street in front of Steward and jumped out of their car with their guns drawn. The officers instructed Steward to put his hands in the air.

¶ 27    Defendant, Mason, and Neal remained in the car and watched Steward. Eventually, the officers ran to defendant's car with their guns drawn and told defendant to "freeze" and put his hands up. Defendant repeatedly told the officers his hands were up, but the officers could not see him because his windows were tinted. The officers ordered him out of the car, but he refused because he was "doing nothing" and driving on a suspended license. Mason indicated she was scared so defendant told her to exit the car, but he still refused to exit. Once Mason exited, an officer reached in the car and pulled Neal out of the back seat. The officers opened defendant's door and he stepped out. One officer grabbed his wrist and told defendant he was not under arrest, but they wanted to handcuff him for the officers' and his own safety. Defendant refused to be handcuffed and "put up a tussle." Two officers subdued him and handcuffed him.

¶ 28    After running defendant's name and identification, the officers asked defendant why he was "acting like an a***" when he was driving on a suspended license. Defendant told them

he wanted to remain in his car because it was parked, and he knew they would run his name if he exited. Defendant denied possessing or having seen the recovered gun. He also denied referring to money as "bread." He acknowledged that he had three prior convictions for possession of a controlled substance, manufacture and delivery of a controlled substance, and robbery.

¶ 29 During closing arguments, defense counsel argued, in relevant part, the gun and defendant's subsequent statement should have been suppressed. Counsel reiterated that the police did not see a crime being committed and therefore lacked probable cause to search defendant's car. Counsel also argued that, even if the gun was in plain view, possession of a gun in Illinois is not a crime and the police did not know whether defendant was legally in possession of the gun until after they removed him from the car and placed him in custody.

¶ 30 ### 4. *Ruling on Defendant's Motion to Reconsider*

¶ 31 The court denied defendant's motion to reconsider the denial of his motion to suppress. The court concluded that a "reasonable person might believe the possibility of a narcotics transaction taking place" based on the circumstances: a person, in a high narcotics area, standing next to a car holding money. The court further found the officers "didn't necessarily know" that narcotics sales were taking place, but "it gave rise to some suspicion on their part." Although the officers did not know whether defendant had a valid Firearm Owner's Identification Card or concealed carry license when they observed defendant with a gun, the court found his furtive movements and attempts to conceal the gun were "certainly," "more than enough reasonable grounds for the officers to conduct a further investigation" for safety purposes, which required them to "take control of the individuals and the weapon." The court explained:

> "I don't think we've come to a point, nor should we, where an officer's encountering an individual doing what [defendant] was observed doing at 6:30 in the morning in a high crime area that they need to have a chat to determine FOID or CCL status at that point in time prior to making sure that that weapon is not in a position where it could kill one of those police officers, or it could kill any citizen in the vehicle or outside the vehicle."

The court opined that "what might be certainly criticized as an abuse of discretion would be if the officers pulled their guns and started shooting. But that's not what happened here." The court additionally concluded that the officers were not required to Mirandize defendant prior to asking whether he had a valid Firearm Owner's Identification Card or concealed carry license because the question was not asked during a custodial interrogation to determine the elements of a crime.

¶ 32 ### 5. *Finding of Guilt*

¶ 33 The court found defendant guilty of two counts of UUWF (counts II and III), and six counts of AUUW (counts VI-XI). It determined that Officer Beckman's testimony at the suppression hearing was credible and that he was credible at trial. The court also noted that Officer Beckman's testimony was corroborated by Officer Gallagher, a "very credible witness." The court explained that defendant's version of events "stretches the bounds of credibility" where he testified that he refused to get out of his car because his license was suspended but was later willing to fight and refuse to obey the police. The court pointed out that neither officer testified

that defendant resisted arrest and "it's the first time in [the court's] 40 some years of being involved in criminal law that the defendant said, I resisted the police and I got into a tussle with the police, and the police said that didn't happen."

¶ 34    The court subsequently denied defendant's posttrial motion, wherein he again argued the gun should have been suppressed. It merged the counts into count VI, AUUW without a valid Firearm Owner's Identification Card or concealed carry license, and sentenced defendant to eight years' imprisonment.

¶ 35                                   II. ANALYSIS

¶ 36    Defendant claims the trial court erred in denying his motion to suppress because police lacked reasonable suspicion to justify a *Terry* stop. Defendant asks us to review the issue on the merits, or alternatively, "as a matter of plain error or ineffective assistance of counsel" because "the precise issue of whether the *Terry* stop was unlawful at its inception" was not raised in the trial court.

¶ 37    We find it unnecessary to address the forfeiture issue because the initial encounter between Officer Beckman and defendant did not implicate the fourth amendment. See *People v. Almond*, 2015 IL 113817, ¶ 65 (because the incident between the officer and the defendant was a consensual encounter, there was no need to address the defendant's remaining argument that the incident constituted an improper *Terry* stop). The judgment of the circuit court of Cook County must be affirmed.

¶ 38    We apply a two-part standard of review when reviewing a trial court's ruling on a motion to suppress. *People v. Holmes*, 2017 IL 120407, ¶ 9. We afford great deference to the trial court's findings of fact and reverse those findings only if they are against the manifest weight of the evidence. However, we may undertake our own assessment of the facts "in relation to the issues and may draw [our] own conclusions when deciding what relief should be granted." *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Thus, we review *de novo* the trial court's ultimate legal ruling as to whether the evidence should be suppressed. *Holmes*, 2017 IL 120407, ¶ 9.

¶ 39    In doing so, we may consider evidence adduced in both the suppression hearing and at trial. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). Further, we may affirm the trial court's ruling on any basis supported by the record. *People v. Johnson*, 208 Ill. 2d 118, 128 (2003) (noting "[i]t is a fundamental principle of appellate law" that, on appeal, a reviewing court reviews the trial court's conclusion and not its reasoning).

¶ 40    In this court, defendant does not contend that the trial court's findings of fact were erroneous; instead, he claims that the court erred in reaching its legal conclusion. Specifically, he argues that he was the victim of an unlawful seizure when the officers "boxed in" his vehicle as they arrived on the scene and they did not have reasonable suspicion of criminal activity to conduct a *Terry* stop. He also asserts that his mere possession of a firearm is not a crime pursuant to *People v. Aguilar*, 2013 IL 112116, and therefore did not justify the *Terry* stop or provide probable cause for his arrest or subsequent search of his vehicle. Thus, defendant maintains that the gun, and his statement that he did not have a concealed carry license, should have been suppressed as the fruits of an unlawful search and seizure.

¶ 41    The United States and Illinois Constitutions guarantee citizens the right against unreasonable searches and seizures. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6.

Generally, reasonableness under the fourth amendment requires a warrant supported by probable cause. *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 12. However, our supreme court has recognized three types of police-citizen encounters that do not constitute an unreasonable seizure: (1) arrests, which must be supported by probable cause; (2) a brief investigative stop, also known as a *Terry* stop; and (3) consensual encounters that do not involve coercion or detention and therefore do not implicate fourth amendment interests. *Luedemann*, 222 Ill. 2d at 544.

¶ 42 In the instant case, the parties disagree on the timing of defendant's seizure. Defendant argues he was seized for fourth amendment purposes when the officers first arrived on the scene because their approach amounted to a show of authority such that a reasonable person would feel compelled to submit to the officers at the time they stopped their vehicle. Specifically, defendant argues that the officers drove the wrong way on Grenshaw, boxed in his vehicle when they parked, and two officers with flashlights approached his car. He further contends the seizure was unlawful because the police lacked a reasonable suspicion of criminal activity to justify an investigative *Terry* stop.

¶ 43 The State replies that the initial encounter was a third-tier consensual encounter prior to Officer Beckman seeing defendant with the gun. The State asserts that, once Officer Beckman saw defendant with the gun, the officer had, based on the totality of the circumstances, a reasonable suspicion that criminal activity was afoot to justify a *Terry* stop and secure the gun. Finally, the State maintains that, upon securing the gun and learning that defendant did not have a concealed carry license, the officers had probable cause to arrest defendant.

¶ 44 A person is considered seized when a law enforcement officer, " ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' " *Id.* at 550 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991), quoting *Terry*, 392 U.S. at 19 n.16). To determine whether an individual seated in a parked car has been seized, the relevant inquiry is whether a reasonable person in that position would have believed that he was free to decline the officer's requests or otherwise terminate the encounter. *People v. Gomez*, 2018 IL App (1st) 150605, ¶ 20 (citing *Luedemann*, 222 Ill. 2d at 550-51).

¶ 45 When determining whether an individual was seized, we consider (1) the threatening presence of multiple officers, (2) the display of a weapon by an officer, (3) some physical touching of the individual's person, and (4) the use of language or tone of voice indicating that compliance might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Luedemann*, 222 Ill. 2d at 553. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *People v. Fields*, 2014 IL App (1st) 130209, ¶ 22. Additionally, other factors that have been found indicative of a seizure of a parked vehicle are boxing the car in, " 'many' " officers approaching the car on all sides, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, and use of flashing lights. *Luedemann*, 222 Ill. 2d at 557 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 434-35 (4th ed. 2004)).

¶ 46 Here, the record does not support defendant's contention that he was seized within the meaning of the fourth amendment when the officers initially stopped their car or approached his vehicle. The record shows that, as the officers were traveling the wrong direction on Grenshaw in an unmarked car with municipal license plates, they noticed defendant's car and Steward standing at the passenger side holding money. The officers stopped their car on the street, 15 to 25 feet away from defendant but facing his vehicle. See *id.* at 558 (an officer

- 8 -

parking in the middle of a roadway, without signaling compliance or other shows of authority, was not coercive behavior indicative of a seizure).

¶ 47     Upon stopping, Officer Beckman observed Steward look at the officers and hastily put money into his pocket while defendant made "furtive" movements toward the floorboard. At that point, the officers exited their car to conduct a field interview. See *Bostick*, 501 U.S. at 434-35, 439 (police have the right to approach citizens and ask potentially incriminating questions even when officers have no basis for suspecting a particular individual; they may generally ask questions of that individual).

¶ 48     Although four officers were present, the record indicates that only two officers, in plain clothes and with a flashlight, approached defendant's car. At this point, the officers were actually outnumbered by defendant, Neal, Mason, and Steward. See *Almond*, 2015 IL 113817, ¶ 58 (no seizure where two officers were outnumbered by defendant and two men inside a store). Moreover, Officer Beckman's use of his flashlight was not coercive where he testified that it was still dark at the time of the encounter. See *Luedemann*, 222 Ill. 2d at 561-63 (without other evidence of coercive behavior an officer's use of a flashlight was merely incident to his performance of his job after dark). In addition, because the officers were in an unmarked car there is no indication that they had, or activated, flashing lights. The record also does not show that, as the officers approached, they displayed their weapons or used language and tone of voice compelling defendant to comply with their request. See *id.* at 554 ("[I]t would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled."). Finally, although Officer Beckman testified that he jogged over to defendant's car, we cannot conclude based on this factor, standing alone, that defendant was seized at the time the officers initially approached his vehicle.

¶ 49     The dissent's position is not factually supported by the record before us. The dissent places great emphasis on defendant's testimony "that the officers jumped out of their cars with their guns drawn" and "then the three officers came running over to [Mr. Hood's] car."

¶ 50     Defendant's testimony was that he was talking to Mr. Steward who "walked off" prior to the police arriving. The police "stopped in the middle of the street in front of [Steward.] They jumped out of their car with their guns drawn and told Mr. Steward to put his hands up." Defendant was sitting in his car "watching to see what was happening to [his] friend." After that, the officer on the passenger's side of defendant's car pointed to the car and the three officers came running over to the car and pulled their guns out. This is significantly different than the "three officers suddenly emerged from two squad vehicles, brandishing guns, either jogging or running toward Mr. Hood's vehicle," as the dissent characterizes the circumstances. *Infra* ¶ 84.

¶ 51     More importantly, the trial court found that defendant's story was completely lacking credibility. It is axiomatic that great deference must be given to the trial court's credibility findings. *People v. Grant*, 2013 IL 112734, ¶ 12. Yet, the dissent wholly endorses defendant's testimony, takes it as true, and repeatedly mentions the officers having their guns drawn to support the conclusion that defendant was seized before the officers saw him in possession of an illegal weapon. Defendant was the only person who testified to this "fact."

¶ 52    Without any corroborating testimony in the record that the officers drew their guns and unable to rely on the eyewitness testimony of Steward, who said that he did not pay attention to the police, the dissent turns to Officer Beckman's lone statement that there was "an officer safety issue" to support its factual finding that he drew his gun. The dissent states that "Officer Beckman's testimony that [defendant's] movements suggested to him 'an officer safety issue' *supports* [defendant's] testimony that Officer Beckman drew his gun as he approached the Pontiac." (Emphasis added.) *Infra* ¶ 88. The dissent then explains that "[o]ne *expects* police to arm themselves when they face issues of officer safety." (Emphasis added.) *Infra* ¶ 88. As it stands, the dissent's factual finding that Officer Beckman drew his gun is based on an expectation and testimony found to be completely lacking in credibility.

¶ 53    The dissent likewise makes the factual finding that defendant's vehicle was "blocked in" when the officers parked their vehicle 15 to 25 feet in front of defendant's vehicle. To the extent our conception of what constitutes "blocked in" is relevant, it seems apparent that a vehicle parked 15 to 25 feet away would not be blocking the other vehicle. The record is totally undeveloped on the physical landscape of the scene. It is impossible to know, for example, the officers' precise positions, the width of the street, or about the presence of other vehicles or features. Again, the dissent takes defendant's testimony at face value and construes the record against the State to make unsupported factual findings.

¶ 54    When the dissent sets forth its analysis of the "facts" regarding whether defendant was "seized" (see *infra* ¶¶ 89-90), the recitation is comprised entirely of testimony to which this court should not afford any weight and to inferences from the testimony that are unreasonable or belie the officers' stated observations that the trial court found to be "very credible."

¶ 55    The dissent ultimately concludes that "[t]he motion to suppress that counsel failed to present had merit" and "[defendant] has shown that his trial counsel provided ineffective assistance of counsel by failing to file the motion." *Infra* ¶ 105. But to prevail on an ineffective assistance of counsel claim the defendant must satisfy *both* prongs of the *Strickland* test and show that (1) his counsel was deficient and (2) the deficiency caused him or her to suffer prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Bew*, 228 Ill. 2d 122, 127 (2008); *People v. Henderson*, 2013 IL 114040, ¶ 15 (to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious and that a reasonable probability exists that the outcome of the trial could have been different had the evidence been suppressed). Here, the dissent makes no finding on the first prong of the *Strickland* test and does not discuss whether the trial outcome would have been different if the evidence had been suppressed. See *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 56    The dissent states that the motion to suppress filed by counsel "did not address the issue of whether police had a valid basis for a *Terry* stop." *Infra* ¶ 83. Fatal to that conclusion, however, is the fact that the motion to suppress expressly alleged that the "arrest search and seizure were made in violation of the defendant's right under the Fourth Amendment" and at the suppression hearing, counsel developed the factual basis upon which the trial court considered and denied any *Terry* issues. Defendant points this out in his opening brief: "the factual basis for [the *Terry*] issue was fully developed during testimony at the suppression hearing and at trial, and the trial court was fully aware of the circumstances surrounding the stop."

¶ 57    At the close of the suppression hearing the trial court expressly engaged in a *Terry* analysis, stating that, "the officer observes something that he perceived to be somewhat suspicious activity of a potential drug transaction," stopped "the police vehicle approximately 25 feet

- 10 -

away" from defendant's car and "observed [defendant] making various motions as if he were concealing something or removing something or hiding something or taking something form below the seat level of his car." The trial court denied the motion to suppress.

¶ 58    At the hearing on defendant's motion to reconsider, the trial court for the second time conducted a *Terry* analysis, indicating that the officers saw "what I believe a reasonable person might believe [was] the possibility of a narcotics transaction taking place" and "the officers didn't necessarily know that that is what in fact was taking place. But it gave rise to some suspicion on their part. And so they stopped their vehicle and quickly approached the Pontiac Bonneville that the person had been standing in front of with United States currency in his hand." The trial court found defendant not to be credible and denied the motion to reconsider.

¶ 59    It is clear, based on this record, that neither the motion to suppress itself, nor the testimony given at either hearing were limited to the issue of probable cause, and the trial court addressed the legality of the initial stop under *Terry* before denying both motions.

¶ 60    We conclude that after stopping the police car, approaching defendant's car, and seeing the gun, the totality of the circumstances quickly gave rise to a reasonable suspicion on the part of the officers that criminal activity was taking place and therefore justified an investigatory *Terry* stop.

¶ 61    Pursuant to *Terry*, "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). During a *Terry* stop, an officer may temporarily detain an individual for questioning where the officer reasonably believes the individual has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22; *Sanders*, 2013 IL App (1st) 102696, ¶ 13.

¶ 62    In order to justify a *Terry* stop, officers must be able to point to specific and articulable facts which, considered with the rational inferences from those facts, make the intrusion reasonable. *Sanders*, 2013 IL App (1st) 102696, ¶ 14; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 14. When determining whether an investigatory stop is reasonable, we rely on an objective standard and view the facts from the perspective of a reasonable officer at the time of the stop. *Sanders*, 2013 IL App (1st) 102696, ¶ 14. A decision to make a *Terry* stop is a practical one based on the totality of the circumstances. *Id.*

¶ 63    Here, Officer Beckman articulated several facts which justified an investigatory stop based on the totality of the circumstances. Specifically, Officer Beckman testified that the stop occurred in a high narcotics area. Although the fact that it was a high narcotics area cannot, alone, provide reasonable suspicion to stop defendant, it is a factor that may be considered along with others to determine whether the officer had reasonable suspicion based on the totality of the circumstances. See *People v. Lockett*, 311 Ill. App. 3d 661, 669 (2000) (noting that gang activity in the area one week prior to the defendant's detention, coupled with, among other things, the officer's belief that the defendant was hiding a weapon in his hand, gave the officer a reasonable suspicion that the defendant was about to commit a crime).

¶ 64    The dissent rightly points out the troubling aspects of police officers invoking the notion of "high crime areas" as a substitute for criteria that implicates officer safety concerns or that justifies a reasonable suspicion of criminal activity. See *infra* ¶¶ 82, 100. The dissent would find "high narcotics area" and "high crime area" provide inappropriate factors to conduct an investigatory stop under article I, section 6, of the Illinois Constitution. While we do not

- 11 -

necessarily disagree with the sentiment contained in the dissent, the law and the facts of this case do not allow us to agree with such a holding.

¶ 65    The binding precedential law allows officers to consider that an area is known for high levels of crime. The United States Supreme Court held in *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), that the fact that a stop occurred in a "high crime area" is among the relevant contextual considerations in a *Terry* analysis. The Illinois Supreme Court, citing *Wardlow*, also has held that officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are suspicious to warrant further investigation. *People v. Timmsen*, 2016 IL 118181, ¶ 13. Finally, this court has very recently cited *Wardlow* in holding the fact that the stop occurred in a high crime area is a relevant contextual consideration in any *Terry* analysis. *People v. Salgado*, 2019 IL App (1st) 171377, ¶ 25. In *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 64, this court, as a partial basis for finding that the police did not have a reasonable suspicion that a crime was being committed, stated that no testimony indicates the officers believed the neighborhood to be dangerous.

¶ 66    Plainly, the officers' presence in an area in which their experience informs them about a high level of criminal activity is a relevant consideration when we are sitting in judgment about the reasonableness of the officers' actions. *Wardlow*, 528 U.S. at 124; see also *Timmsen*, 2016 IL 118181, ¶ 13 ("officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation, and thus, the fact that an investigatory stop occurred in a high-crime area is among the relevant contextual considerations in a *Terry* analysis"). We have binding precedent on the matter from the Supreme Court of the United States and the Illinois Supreme Court, so we need not, nor should we, look to other states or federal court dissents for guidance—we are duty bound to apply that law.

¶ 67    While the dissent would hold that police officers can no longer consider the amount of crime that occurs in an area to inform their policing decisions in that area, the Supreme Court of the United States and the Illinois Supreme Court have expressly authorized that consideration. As our supreme court recently reminded us, the "circuit and appellate courts are bound to apply this court's precedent to the facts of the case before them under the fundamental principle of *stare decisis*" and choosing to do otherwise is "serious error." *Yakich v. Aulds*, 2019 IL 123667, ¶ 13. When the supreme court has declared the law on a particular point, " 'it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.' " (Emphasis omitted.) *Id.* (quoting *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61). So, while the dissent is free to question the propriety of the continued consideration of the character of a neighborhood in making policing decisions, it is not free to disregard the settled law and declare that we should not follow it.

¶ 68    Moreover, in this case, the officers had far more than just their presence in a high crime neighborhood to justify further investigation. Officer Beckman also saw defendant "making movements towards the bottom of his seat while he was seated." It appeared to Officer Beckman that defendant was retrieving something from the floorboard. At trial, Officer Beckman added that when they stopped in front of defendant's car, defendant was making "quick, furtive movements toward what appeared to be the floorboard area as [if] he was retrieving something." As Officer Beckman approached defendant's car, he saw defendant placing a gun in a black plastic bag and throwing it into the backseat where another individual

- 12 -

was seated. Based on the totality of these circumstances, Officer Beckman had a reasonable, articulable suspicion of criminal activity to justify a *Terry* stop. See, *e.g.*, *Gomez*, 2018 IL App (1st) 150605, ¶ 30 (finding a defendant's "furtive behavior" and attempts to conceal a gun provided officers with reasonable suspicion that he unlawfully possessed the gun).

¶ 69 Upon seeing defendant attempting to conceal the gun, the officers were permitted to conduct a protective sweep of his car. See *People v. Colyar*, 2013 IL 111835, ¶ 34 (extending the *Terry* protective search for weapons to permit a protective search of a passenger compartment of a vehicle during an investigatory stop and explaining the " 'crux' " of *Terry* is an interest in maintaining officer safety (citing *Terry*, 392 U.S. at 23)). As *Terry* instructs, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. "The search is permissible only when the officers possess a reasonable belief, based on specific and articulable facts and reasonable inferences from those facts, that the individual was dangerous and could gain control of a weapon." *Colyar*, 2013 IL 111835, ¶ 39.

¶ 70 The police officers in this case had more than a reasonable belief that defendant was in possession of a weapon. Officer Beckman actually observed defendant toss a gun into the back seat of his car, where another individual, Neal, was located and would have possible access to the weapon. As soon as Officer Beckman observed defendant with the gun, Officer Beckman alerted Officer Gallagher to the weapon. Officer Gallagher immediately recovered the bag containing the gun from the back seat. These circumstances demonstrate officer safety was an issue and that the search was "properly limited to locating the gun and neutralizing the threat." *Id.* ¶¶ 39, 52 (an investigative search of a passenger compartment should be limited to the area where a weapon may be located). Thus, the brief search of defendant's car and recovery of the loaded gun was warranted and permissible as part of the *Terry* stop, and the gun was admissible as evidence. See *id.* (noting weapons seized during a protective search for weapons during a *Terry* stop are admissible (citing *Terry*, 392 U.S. at 52)).

¶ 71 Nevertheless, defendant maintains that the mere possession of a firearm is not a crime so Officer Beckman's observation of him with a gun could not provide either reasonable suspicion of criminal activity or probable cause to arrest him and search his vehicle. We disagree. Although possession of firearm is not a crime and the officers were unaware of defendant's status as a felon or whether he possessed a valid Firearm Owner's Identification Card or concealed carry license, his efforts to conceal and toss the gun were sufficient to provide the officers with a reasonable suspicion that he was not in lawful possession of the gun. See *id.* ¶ 49 (police officers are not required to completely eliminate any legal explanation for a defendant's suspected possession of a firearm and establish that the defendant was committing a weapons offense prior to investigating further during a *Terry* stop).

¶ 72 Critically, defendant subsequently admitted he did not have a concealed carry license, thus confirming that he was not lawfully permitted to carry a gun. Although he asserts that admission should be suppressed because he was not Mirandized, the State correctly points out that the Firearm Concealed Carry Act permits a police officer to ask during an investigatory stop whether a person carrying a firearm has the requisite license. 430 ILCS 66/10(h) (West 2014) ("If an officer of a law enforcement agency initiates an investigative stop *** of a licensee or a non-resident carrying a concealed firearm *** upon the request of the officer the licensee or non-resident shall *** present the license upon the request of the officer ***.").

The officers, therefore, acted within their authority when they asked defendant about whether he had a concealed carry license, and his statement that he did not have a concealed carry license was properly admitted.

¶ 73 Having concluded that the police were justified in initiating an investigatory *Terry* stop and recovering the weapon from defendant's vehicle, we turn to whether the police had probable cause to arrest defendant following the recovery of the gun. We find that they did. An officer has probable cause to arrest a suspect when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the suspect has committed a crime. *People v. Jackson*, 232 Ill. 2d 246, 275 (2009). At the time of the *Terry* stop and defendant's subsequent arrest, the officers knew defendant had been in possession of a gun, was attempting to conceal it, and admitted he did not have a concealed carry license. These facts show that the officers had reason to believe defendant had committed a weapons violation, and his arrest was proper.

¶ 74 In sum, we find that defendant's fourth amendment rights were not violated by the officers' conduct in these circumstances. The recovery of the gun and defendant's statement that he did not have a concealed carry license were not the result of an unlawful search and seizure. Accordingly, the trial court did not err in denying defendant's motion to suppress.

¶ 75 Defendant next challenges various fines and fees imposed by the trial court. He argues his fines, fees, and costs order should be reduced by $30 and that his presentence incarceration credit should apply to $145 of fines that are erroneously labeled as fees.

¶ 76 Defendant acknowledges that he failed to preserve these issues, but argues they are reviewable under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967) and the plain error doctrine or, alternatively, as a claim of ineffective assistance of counsel for failure to object to the fines and fees errors. The State concedes the fines, fees, and costs order is incorrect and agrees it should be modified.

¶ 77 On February 26, 2019, while this appeal was pending, our supreme court adopted new Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019), which sets forth the procedure in criminal cases for correcting sentencing errors in, as relevant here, the "imposition or calculation of fines, fees, and assessments or costs" and "application of *per diem* credit against fines." Ill. S. Ct. R. 472(a)(1), (2) (eff. Mar. 1, 2019). On May 17, 2019, Rule 472 was amended to provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). "No appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule unless that alleged error "has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Therefore, pursuant to Rule 472, we "remand to the circuit court to allow [defendant] to file a motion pursuant to this rule," raising the alleged errors regarding the imposition of fees and the application of *per diem* credit against fines. Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 78                                    III. CONCLUSION

¶ 79 Accordingly, the fines and fees issue is remanded pursuant to Rule 472(e). The trial court is affirmed in all other respects.

¶ 80    Affirmed and remanded as to fines, fees, and costs.

¶ 81    JUSTICE WALKER, dissenting:

¶ 82    I must respectfully dissent because constitutional protections for underprivileged residents cannot be "suspended or reduced in so-called 'high crime' [or high narcotic] neighborhoods." *United States v. Black*, 525 F.3d 359, 366 (4th Cir. 2008) (Gregory, J., dissenting). When law-abiding people live, work, visit, or attend school in communities that the police describe as high-crime or high-narcotic areas, they are often condemned without the protection of the law. I cannot join the majority's decision to find that Mr. Hood's initial encounter with the police was not a seizure, and I find that this case involves clear ineffective assistance of counsel.

¶ 83    On December 4, 2014, Officers Beckman and Gallagher worked with Officers Clarke and Urbanski. Around 6:30 a.m., Officer Beckman, while driving the wrong direction on a one-way street, saw Mr. Steward standing beside a Pontiac with cash in his hand. Officer Gallagher stopped the unmarked squad vehicle 15 to 25 feet directly in front of the Pontiac. Mr. Hood sat in the driver's seat of the Pontiac, facing the squad vehicle. Officer Beckman and Officer Clarke went to the driver's side of the Pontiac, while Officer Gallagher went to the passenger side. Officer Beckman handcuffed Mr. Hood moments later, claiming that he found a gun in the vehicle. Police charged Mr. Hood with aggravated unlawful use of a weapon.

¶ 84    Mr. Hood's attorney filed a "Motion to Suppress Physical Evidence," but he used a form document that challenged the evidence only as the product of an unlawful arrest. The motion did not address the issue of whether police had a valid basis for a *Terry* stop.

¶ 85    At the hearing on the motion to suppress, Officer Beckman described the area of the arrest as "a very high narcotic area." Officer Beckman testified that, as he sat in the squad vehicle, he saw Mr. Steward put cash in his pocket. Officer Beckman then "observed [Mr. Hood's] shoulders moving" and that "there was an officer safety issue at that point" because Officer Beckman thought Mr. Hood "was getting something from his floorboard," "which was suspicious" to Officer Beckman. Officer Beckman testified, "I quickly exited my unmarked squad car. I approached. I illuminated the area, his side of the vehicle, which was the driver's side." Beckman "didn't walk"; he "wouldn't say [he] was in a full sprint, but [he] was moving pretty quickly" to get to the driver's side of the Pontiac. Neither party asked Officer Beckman whether he drew his gun as he approached Mr. Hood's vehicle. Although Mr. Hood's attorney presented Mr. Steward as a witness to the arrest, neither party asked Mr. Steward whether the officers drew their weapons before approaching Mr. Hood's vehicle. Mr. Steward stated he did not see police take a gun from Mr. Hood's vehicle.

¶ 86    The trial court found Officer Beckman credible, and his discovery of the gun gave him probable cause to arrest Mr. Hood. The court denied the motion to suppress evidence. Even in the motion to reconsider, defense counsel did not raise the issue of whether the officers had the reasonable suspicion necessary to justify their initial stop of Mr. Hood.

¶ 87    In this appeal, Mr. Hood argues that his trial counsel provided ineffective assistance by failing to move to suppress the evidence based on the lack of justification for the *Terry* stop. Our supreme court explained the relevant standards:

> "[W]here an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable

probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 88 Mr. Hood's attorney did not present him as a witness at the hearing on the motion to suppress. At trial, Mr. Hood testified that the officers "jumped out of their cars with their guns drawn." The State offered no rebuttal, leaving the testimony uncontested. Officer Beckman's testimony that Mr. Hood's movements suggested to him "an officer safety issue" supports Mr. Hood's testimony that Officer Beckman drew his gun as he approached the Pontiac. One expects police to arm themselves when they face issues of officer safety, when "[t]he brandishing of the weapon *** [is] necessary for the protection of the officers." *People v. Starks*, 190 Ill. App. 3d 503, 509 (1989).

¶ 89 The majority concludes that the unargued suppression motion lacked merit because until the moment the police saw the gun, there was no seizure. I disagree with the majority's finding because the majority misinterprets the facts of this case. Police blocked in Mr. Hood's vehicle, three officers moved quickly toward Mr. Hood, and the officers had their guns drawn. Police seized Hood once they started quickly approaching him.

¶ 90 The evidence at trial and on the motion to suppress establishes that three officers suddenly emerged from two squad vehicles, brandishing guns, either jogging or running towards Mr. Hood's vehicle. One officer approached the passenger side, and two approached the driver's side. If Mr. Hood had tried to drive forward, he would have hit Officer Gallagher's unmarked squad vehicle 15 to 25 feet directly in front of him. If he tried to veer left, he might hit Officer Beckman or Officer Clarke, and if he tried to veer right, he might hit Officer Gallagher. If he attempted to drive in reverse, he would invite a stop for going the wrong way on a one-way street. Once the officers began their rapid approach toward the Pontiac, they effectively boxed Mr. Hood in, and certainly he was not free to terminate the encounter. *People v. Gomez*, 2018 IL App (1st) 150605, ¶ 20. Mr. Hood was seized.

¶ 91 A police officer has seized an individual, within the meaning of the fourth amendment, when the officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006). Mr. Hood was definitely seized because three officers made a show of authority by approaching together (see *id.* at 553) at a jog or run (see *People v. Abram*, 2016 IL App (1st) 132785, ¶ 53; *State v. Tucker*, 642 A.2d 401, 405 (N.J. 1994)) while displaying weapons (see *Luedemann*, 222 Ill. 2d at 553) after blocking Mr. Hood's vehicle (see *United States v. Stover*, 808 F.3d 991, 997 (4th Cir. 2015); *People v. Mills*, 115 Ill. App. 3d 809, 814 (1983)) and positioning themselves on both sides of Mr. Hood's vehicle. See *People v. Gherna*, 203 Ill. 2d 165, 179-80 (2003) (finding that positioning of officers on either side of defendant's vehicle constituted an official show of authority to which a reasonable innocent person would feel compelled to submit).

¶ 92 The majority asserts that this dissent draws "inferences *** that belie the officers' stated observations." *Supra* ¶ 54. Officer Beckman admitted that he quickly came to the driver's side of Hood's car, and Officer Gallagher admitted that he approached the passenger side. Neither officer ever claimed he did not draw his gun. No further evidence is needed to infer that police boxed Hood in when officers were coming quickly at both sides of Hood's car, with their squad car only a few feet away, stopping directly in front of Hood, where Hood could not legally drive any distance in reverse. The factual assertions in this dissent do not conflict in any way with the testimony of the officers. Notably, the officers' testimony conflicts with the majority's assertion that the officers "stopped *** in front of [Steward]" and "instructed Mr. Steward to

put his hands in the air." *Supra* ¶ 26. The majority failed to acknowledge the unrebutted evidence, supported by Officer Beckman's assertion that he perceived "an officer safety issue," that the officers drew their guns as they hurried to Hood's car.

¶ 93 The State argues that Mr. Hood's encounter with police was a consensual encounter. Nonetheless, the majority finds that Mr. Hood was not seized because there was not an encounter until police observed the gun. Ostensibly, then, the majority finds that Mr. Hood could have simply driven off as the officers jogged towards him. Mr. Hood clearly could not have driven around the unmarked squad vehicle parked directly in front of him without the risk of being killed. The officers seized Mr. Hood, within the meaning of the fourth amendment, when they jogged towards him, with guns drawn, positioned themselves on both sides of his vehicle, and blocked his vehicle from moving forward.

¶ 94 Under the fourth amendment,

"a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime. [Citations.] The officer must have a 'reasonable, articulable suspicion' that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119 (2000). Although 'reasonable, articulable suspicion' is a less demanding standard than probable cause, an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity. [Citation.] The investigatory stop must be justified at its inception and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen." (Internal quotation marks omitted.) *People v. Timmsen*, 2016 IL 118181, ¶ 9.

¶ 95 At the time of the seizure, Officer Beckman saw Mr. Steward, in an area that Officer Beckman described as "high narcotic," putting cash in his pocket. Then Officer Beckman claims that through Mr. Hood's tinted windows, he saw Mr. Hood's "shoulders moving" in "quick, furtive movements" that looked to Officer Beckman like Mr. Hood "was getting something from his floorboard." The fact that Officer Beckman described the area as one with a high volume of narcotic sales does little to justify the stop. See *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14. "The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000). The sight of Mr. Steward putting cash in his pocket should not carry much weight because people in underprivileged communities, like people in privileged communities, use cash for noncriminal purposes and use more of it than those in other socio-economic classes. See Malte Krueger, *Card Rewards: Is There A 'Reverse-Robin-Hood-Effect'?*, 34 No. 3 Banking & Fin. Services Pol'y Rep., 20, 21 (March 2015). Lower-income people have fewer debit cards, fewer credit cards, and fewer bank accounts. Michael S. Barr, *Banking the Poor*, 21 Yale J. on Reg. 121, 124 (2004). They are more likely to cash their checks at currency exchanges. *Id.* Furthermore, the officers did not see any exchange take place. See *United States v. McCray*, 148 F. Supp. 2d 379, 388 (D. Del. 2001). The officers approached in an unmarked vehicle. Therefore, Stewart may have placed his cash back into his pocket to avoid a potential robbery.

¶ 96 Mr. Hood's shoulder movement does not justify the seizure. "Nervousness and furtive gestures may, in conjunction with other objective facts, justify a *Terry* search, but ordinarily

- 17 -

'[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity.' " *State v. Lund*, 573 A.2d 1376, 1383 (N.J. 1990) (quoting *State v. Schlosser*, 774 P.2d 1132, 1137 (Utah 1989)). Mr. Hood's encounter with police resulted from no "more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

> "[T]he weighty social objective of crime prevention might well be served by permitting stops and detentions without any requirement of a reasonable suspicion that criminal activity has or is about to take place. In the absence of specific and articulable facts supporting the reasonable suspicion, however, 'the balance between the public interest and [defendant's] right to personal security and privacy tilts in favor of freedom from police interference.' *Brown v. Texas*, [443 U.S. 47,] 52 [(1979)]." *People v. Thomas*, 660 P.2d 1272, 1277 (Colo. 1983) (*en banc*), *overruled in part on other grounds by People v. Archuleta*, 980 P.2d 509, 515 (Colo. 1999).

¶ 97     Our recent decision in *People v. Salgado*, 2019 IL App (1st) 171377, involves circumstances that contrast in informative ways with the circumstances here. First, police in *Salgado* did not describe the area of the arrest nebulously as "a very high narcotic area," an epithet police might use for almost any place in Chicago where Blacks or Latinx persons reside. Instead, police testified that around the 3800 block of West 30th Street, the Latin Kings and Two-Six gangs had engaged in " 'recent aggravated batteries with firearms.' " *Id.* ¶ 7. The defense could, in principle, challenge and verify the specific assertion, discovering the dates and precise locations of the aggravated batteries committed by members of the Latin Kings and Two-Six gangs.

¶ 98     Next, Salgado, unlike Hood, clarified that he did not feel that Sergeant Rivera had seized him, as he continued walking past Rivera following Rivera's initial question. Before the seizure, Rivera saw Salgado reach towards a gun-shaped bulge at Salgado's waistband. *Id.* ¶ 5. Few people carry gun-shaped objects other than guns in their waistbands. Many people reach for many different kinds of objects on the floors of their cars. By reaching for the object in his waistband, in an area where several incidents with firearms had recently occurred, Salgado gave Rivera grounds for a *Terry* stop. Hood, by reaching towards the floor of his car while parked in a Black neighborhood, did not give police here grounds to believe they saw criminal activity. Police in *Salgado* had grounds for the *Terry* stop of Salgado; police here did not have grounds for a *Terry* stop of Hood.

¶ 99     If there is a hand-to-hand transaction or a robbery in progress, the police should conduct an investigatory stop because no law-abiding residents want drugs to be sold or a robbery to occur in their community. Police have a difficult time fighting crime. However, police cannot diminish constitutional protections in underprivileged communities. The phrases "high narcotic area" and "high crime area" became popular years ago when most lawmakers and judges believed it was lawful to separate communities based on race and class. The paradigm has shifted, and it is now inappropriate to police underprivileged communities with fewer constitutional protections and disregard for lives and liberties.

¶ 100     The majority seems to hold that people in so-called high crime or high narcotic areas cannot walk around with United States currency in their hands, but people in "low crime" or "low narcotic" areas are free to walk the street with cash in hand. I disagree with the majority. I agree with the United States Court of Appeals for the Seventh Circuit when the court found

that holding one's hands in a pocket should not be grounds for a search, even if it occurs at night in a high-crime area. We cannot support a rule that seemingly would allow all those people who typically spend time in "low crime" areas (read: more affluent areas of town) to walk around with hands pocketed at night while not being subject to search, while depriving people in higher crime areas of that same ability. I would find that a "high narcotic area" and a "high crime area" are inappropriate factors to conduct an investigatory stop under article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). These destructive labels should be repudiated and abandoned because they reduce constitutional protections in certain communities.

¶ 101    Under the totality of the circumstances, the officers did not have the reasonable, articulable suspicion of criminal activity needed to justify an investigatory stop. See *Harris*, 2011 IL App (1st) 103382, ¶ 17; *Mills*, 115 Ill. App. 3d at 815. In Illinois, the reputation for criminal activity in certain areas should not be imputed to an individual. The investigatory stop in this case violates article I, section 6, of the Illinois Constitution, which prohibits unreasonable searches and seizures.

¶ 102    Finally, the majority contends that defense counsel actually challenged the validity of the *Terry* stop. The majority quotes the Motion to Suppress Physical Evidence: "[T]he arrest, search and seizure were made in violation of the defendant's right under the Fourth Amendment." The majority implies that "seizure" in the motion refers to the *Terry* stop of Hood.

¶ 103    The motion says:

"[P]olice officers *** , without lawful authority, seized certain *** evidence which might tend to incriminate the accused.

*** [T]he accused has a possessory or other valid property interest in the area search[ed] from which the aforementioned items [were] seized.

*** [T]he seizure of said items was without lawful authority for one or more of the following reasons:

a. at the time of the arrest, the accused was not violating any Federal, State or Local Law and there existed no probable cause to make the arrest, search or seizure complained of;

b. the arrest, search and seizure complained of was made without any warrant or any authority whatsoever;

c. while probable cause may have existed to make the arrest, search and seizure complained of, there existed no exigent circumstances which excused proceeding without first obtaining a warrant;

d. no consent was given for the arrest, search and seizure complained of;
***

f. The arrest, search and seizure were made in violation of the defendant's right under the Fourth Amendment ***;

g. The search and seizure complained of was not incident to nor contemporaneous with the valid arrest of petitioner."

¶ 104    "Seizure" in the motion unequivocally refers to the seizure of the gun found in Hood's car at the time of the arrest. It does not refer to the seizure of Hood prior to the arrest, when police blocked Hood's car and jogged up to both sides of Hood's car with guns drawn. As the State

correctly observes in its brief, "trial counsel argued only that police lacked probable cause to arrest defendant and/or search his vehicle. [Citations.] Defendant's failure to argue that he was improperly subjected to a *Terry* stop constitutes a forfeiture of the argument." The majority's tortured misconstruction of defense counsel's motion does not change counsel's error, amounting to ineffective assistance, of failing to challenge the *Terry* stop.

¶ 105 The motion to suppress that counsel failed to present had merit. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 41. Mr. Hood has shown that his trial counsel provided ineffective assistance by failing to file the motion. Had his counsel done so, the law supports the suppression of the essential evidence against Mr. Hood.

¶ 106 Notwithstanding the neighborhood, United States currency in Mr. Steward's hand cannot justify an investigatory stop, and Mr. Hood received ineffective assistance of counsel. Therefore, I respectfully dissent.