2020 IL App (1st) 182245

No. 1-18-2245

Opinion filed December 29, 2020.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 9951 |
| | ) | |
| JARMON EDWARDS, | ) | The Honorable |
| | ) | Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant Jarmon Edwards was found guilty of aggravated unlawful use of a weapon after police found a firearm in his vehicle. Defendant was sentenced to two years' probation and 50 hours of community service. On appeal, he contends that the trial court erred in denying his motion to suppress because police committed an unlawful seizure and, alternatively, lacked reasonable suspicion to detain him. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was arrested and then charged with the above-stated offense after police discovered a firearm in his vehicle. Defendant filed a motion to suppress, claiming that police violated his fourth amendment rights by illegally detaining him and searching his vehicle. At the hearing on the motion to suppress, the combined testimony of Chicago police officers Shahrukh Ali and Roger Farias[1] revealed that on June 15, 2017, around 9:40 p.m., while uniformed and on patrol in a marked squad SUV, they received a "shot spotter" alert via dispatch detecting multiple rounds of gunfire near 5648 South Carpenter Street. The electronic notification system, which was issued from a base in California, verified that it was actual gunfire,[2] although there were no 911 calls corroborating any gunfire in the area. Officers proceeded to the identified location, a two-lane street, where they encountered defendant's vehicle in front with its headlights on and "obstructing traffic." While Officer Ali testified it was three feet from the curb, Officer Farias testified it was "parked far from the curb," by at least five-to-six feet. Officer Farias, who was driving the marked SUV, pulled up parallel to the driver's side window of defendant's vehicle. As such, the officers' vehicle faced north, the opposite direction of defendant's vehicle, which faced south.

¶ 4      Officer Farias testified that he asked whether defendant had heard anything, in reference to the shot spotter alert, but Officer Farias could not recall defendant's response. Officer Ali likewise could not recall the conversation. The officers then decided to conduct a traffic stop due to the "traffic infraction" relating to how defendant's vehicle was parked off the curb. Officer Ali later explained that, given the way the vehicle was positioned, "we just wanted to conduct a stop,

_____

[1]The defense presented Officer Ali's testimony, while the State presented Officer Farias's testimony.
    [2]Officer Farias explained that a shot spotter is a "sensor that detects noise and then sends it to another company that determines if it's gunfire or not."

maybe even see if the Defendant heard any shots fired in that area." Officer Farias reversed the police vehicle so that it was angled in front of defendant's car and turned on the overhead emergency lights. As he did so Officer Ali observed[3] defendant "make a movement towards the floorboard of the vehicle" by his feet, which was an "up and down movement" with his right shoulder and arm. Officer Ali, however, could only see defendant from the chest up and could not see his hands. He did not see any weapons at that time. Officer Farias testified that he likewise observed defendant's right arm making "an up and down shoulder to elbow motion *** between his legs" towards the floorboard, but Officer Farias testified this occurred before he reversed the police vehicle, as he was conversing with defendant from about three or four feet away, and defendant made this movement twice.

¶ 5    Following their vehicle's reversal, Officer Ali exited and approached defendant's driver's side door with a flashlight, at which point Officer Ali ordered defendant to show his hands, and defendant complied. Officer Ali asked defendant if he had heard any shots. According to Officer Farias, who also had a flashlight, defendant, with his hands still in the air, then made "a sliding motion from his legs towards the bottom of his seat," as though he were dragging his feet down under the seat. The officers switched sides. Pursuant to Officer Farias's request, defendant, with a shaking hand, searched his wallet for his license. As defendant did so, Officer Farias observed a Firearm Owner's Identification (FOID) card in defendant's wallet, and he then asked defendant if there were any firearms in the vehicle. Defendant said no. Officer Farias nonetheless observed a black holster on the floorboard near defendant's legs (in the same area where defendant had

_____

[3]On direct examination, Officer Ali testified that he observed these movements by defendant when they first pulled up to defendant's vehicle. However, after viewing the dashboard video, he testified that they "saw the subject make movements" once they reversed to get in front of defendant's vehicle. On cross-examination, he stated that defendant made the gestures before the police "exited the[ir] vehicle," and as they reversed. When later questioned by the court about the sequence of events, Officer Ali again stated that he observed the movements by defendant as they were backing up the police vehicle.

been reaching). This prompted Officer Farias to inquire why it was there, to which defendant replied, "I don't know." Officer Ali asked defendant what he was reaching for when the officers approached his vehicle in their own, and defendant responded that it was his phone, which Officer Ali saw resting on the car's center console. According to Officer Ali, defendant appeared nervous and confused.

¶ 6      Officer Farias requested that defendant step out of the vehicle so he could ensure that there was no firearm within defendant's reach. Officer Ali scanned the immediate area and found a fully-loaded firearm under the driver's seat, right where defendant's legs and the holster were. Officer Farias ran defendant's name through the computer system and learned that defendant did not have a valid concealed carry license.

¶ 7      The defense entered three exhibits into evidence, including the body camera footage from both officers and their dashboard footage. Officer Farias testified that at one point in the body camera footage, he told Officer Ali to "watch out" because defendant's arm movements led Officer Farias to believe that there could be a firearm in the car. It was also due to the nature of the call to which they had responded. When asked specifically why he believed there might be a weapon in the vehicle, Officer Farias testified that it was based on the arm movements he observed, the shot spotter alert, the location of the alert, the FOID card, the holster on the floorboard, defendant's leg movements, and defendant's nervousness while handling his wallet. In addition, Officer Farias noted that the dashboard video at a certain point showed a vehicle traveling southbound and having to enter into the northbound lane due to defendant's vehicle obstructing traffic.

¶ 8      In spite of their testimony, both officers acknowledged that the shot spotter alert was the only evidence of gunshots in the area, as they did not hear any gunshots or observe anyone shoot

a gun, run, or report that gunshots were fired. On cross-examination, Officer Farias stated that while parallel to defendant's car and from his higher-up vantage point in the SUV, he did not see any guns, shell casings, or ammunition and did not smell gunpowder or see anything that would indicate a gun had been fired. As Officer Farias sat in his SUV, he did not believe that defendant was the person who fired the gun that triggered the shot spotter alert. In addition, Officer Farias stated that when he turned on his emergency lights and then pulled his police SUV in front of defendant's car, he was blocking defendant's car, and defendant was not at that time free to leave.

¶ 9    The videos presented largely reflect the officers' in-court testimony. The dashboard video shows officers pulling parallel to defendant's car in response to the shot spotter alert, and one officer greeting defendant and then asking if he heard anything. Defendant responds no, and within seconds, Officer Farias begins backing up the police vehicle. As he does so, Officer Ali comments, "he looks nervous." Following this, Officer Ali's body camera shows him walking up to defendant's driver's side door and ordering defendant to show his hands. The officers then switch sides. Officer Farias's body camera reveals him ordering defendant to put his car in park, and defendant complies. Officer Farias then asks defendant for his license and insurance and inquires again whether defendant heard any gunshots. Defendant denies that he did and explains that he pulled up to pick up his stepdad as he appears to be searching his wallet for his license. Officer Farias asks defendant whether he saw anyone, and defendant says no. Officer Farias then asks defendant why he's nervous, but defendant's response is inaudible. Officer Farias comments, "I see you have a FOID card. Is there a firearm in the car?" Defendant replies, "No sir." Officer Farias presses, "You sure?" Defendant answers, "Yes sir." Officer Farias then says he sees a holster on the floor. Officer Ali asks defendant what he was "pushing down there?" and

comments, "You were reaching down there when we got up to you." Defendant responds it was his phone. At that point, Officer Farias then asks defendant to step out of the car.

¶ 10    Following this evidence, including the testimony and video footage, defense counsel argued that the stop was unlawful and not supported by reasonable suspicion from its inception. Counsel also argued against any traffic violations and added that defendant was not a suspect for the shot spotter notification. As such, officers could only rely on defendant's suspicious arm movement, which was insufficient to justify a seizure. At most, the facts supported a stop permitting questioning under *Terry v. Ohio*, 392 U.S. 1 (1968), but not a search for evidence.

¶ 11    The State responded that the officers reasonably feared for their safety, as defendant appeared to possess a gun, based on the a combination of facts, including the shot spotter call and defendant's arm movements, nervousness, sliding leg movement, empty holster, and FOID card. The State added that defendant had lied about the weapon, why he had a holster in the car, and the reason for his suspicious movements. The State argued that the officers' actions were reasonable and noted that defendant's car was in the middle of the street and he was committing a traffic violation.

¶ 12    The court, in detailed oral findings, held that this case was not about whether defendant was guilty of obstructing traffic, but was about whether the police had violated defendant's fourth amendment rights when they detained him, searched his car, and then recovered the loaded firearm. The court noted there was a shot spotter call in the location where defendant was situated and defendant's car was far from the curb. The court found Officer Farias was close to defendant when the cars were parallel and observed that defendant was nervous. In response, Officer Farias reversed his vehicle so as to block defendant, precluding him from driving away. The court noted that the officers did not require defendant to exit his vehicle until the "very end,"

and as such, their actions were reasonable. The court found the fact that police observed an empty holster, combined with defendant's explanation that he had reached for his phone even though it was clearly on the center console, as well as other observations, rendered the officers' decision to guard their safety by asking defendant to exit his car eminently reasonable. Accordingly, the court denied the motion to suppress, finding no fourth amendment violation.

¶ 13    Defendant filed a motion to reconsider, wherein he clarified his argument in a more detailed manner. Defendant argued that the officers performed a *Terry* stop when, within seconds of first questioning defendant, they turned on their emergency lights, reversed their vehicle, and then blocked in defendant's car. Defense counsel argued that the officers, however, did not have reasonable suspicion to support the stop. Defense counsel noted that Officer Farias had testified that when he turned on his emergency lights, he was not investigating defendant as the alleged shooter, detected by the shot spotter alert, and there was no basis to believe he had fired a gun. Defense counsel argued there was no valid basis to find defendant was violating a traffic ordinance. Given the absence of traffic, except for one passing car, the time, and the nature of the quiet residential street, defense counsel argued that the facts did not support finding defendant was unreasonably obstructing traffic. That left only the suspicious arm/shoulder movement, which counsel maintained was insufficient by itself to create reasonable suspicion of criminal activity. Defense counsel asserted that, as a result, the search was the result of an unlawful *Terry* stop.

¶ 14    As before, the State responded that the total factors created reasonable suspicion to support the *Terry* stop. The State noted that the shot spotter issued, and police quickly proceeded to the identified location, where defendant was the lone person with car lights on and partially obstructing the street. The State observed that the officers acted reasonably in questioning the

defendant and saw he was acting nervously in the midst of inquiring whether defendant heard shots fired. The State argued that defendant had responded "no," which was suspicious. Then, officers saw defendant's "furtive movement" as they ended the conversation, which suggested to the officers, given their experience, that there was a gun under the seat. The State argued that the detention was thus reasonable, as were the officers' additional actions of requesting defendant's license, observing the FOID card, and suspecting defendant's senseless excuses for his actions relating to grabbing his phone, his lack of reason for having a holster, and suspicious leg movements. Based on the total evidence, the State argued, the police were justified.

¶ 15    The trial court once again agreed with the State, finding that it would not have been reasonable for officers to simply continue on after observing defendant in the location where shots were reported, with his car at least several feet from the curb and with him making suspicious movements. The court cited the video as support. The court thus found it was reasonable for the officers to converse with defendant and then based on further conversation and observation act in the manner that they did. The court stated, "But we were well before *Terry* at the moment that the officers say, you know what? This guy is acting suspicious, and they see the shoulder dip." The court, in so stating, essentially found that there was no *Terry* stop when the officers reversed their vehicle and turned on their emergency lights. Rather, it came after they had further engaged defendant in conversation and, ultimately, when they asked him to exit the vehicle and then searched it. The court therefore denied the motion to reconsider.

¶ 16    The case proceeded to a bench trial, where Officers Ali and Farias testified consistently with their pretrial hearing testimony. Officer Ali added that when he and Officer Farias approached defendant in their vehicle, they considered him a possible suspect, given his

proximity to the shot spotter[4] notification. Officer Farias added that, following defendant's arrest with *Miranda* warnings on the day in question, defendant reported that he had the gun for protection when he went to play basketball. The parties stipulated that at the relevant time, defendant had a valid FOID card; however, he did not have a valid Illinois conceal and carry license. The State rested after also submitting the videos into evidence. Defendant rested without presenting evidence.

¶ 17    The court found defendant guilty as charged. Defendant filed a motion to reconsider and for a new trial, wherein he renewed his argument as to the motion to suppress. The court denied the motion, sentenced defendant to two years' probation with 50 hours' community service, and required registration as a gun offender. Defendant appealed.

¶ 18                                    II. ANALYSIS

¶ 19    Defendant now challenges the trial court's denial of his motion to suppress. When reviewing such a ruling, we ordinarily apply a two-part standard of review. *People v. Eubanks*, 2019 IL 123525, ¶ 33. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence (*i.e.*, where the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence), but we review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 22.

¶ 20    The defendant bears the burden of proof at a hearing on a motion to suppress. *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 34. If the defendant makes a *prima facie* showing that the evidence was obtained through an illegal search or seizure, the burden then shifts to the State, which must produce evidence justifying the intrusion. *Id.*; *Thornton*, 2020 IL App (1st) 170753,

---

[4]The transcript shows that Officer Ali used the words "spot spotter" but clearly meant "shot spotter."

¶ 23. However, "[t]he ultimate burden of proof remains with the defendant." (Internal quotation marks omitted.) *Dunmire*, 2019 IL App (4th) 190316, ¶ 34.

¶ 21    As before the trial court, defendant maintains that police violated his fourth amendment right to be free from unreasonable search and seizure. See U.S. Const., amend. IV; see also Ill. Const. 1970, art. I, § 6. Since not every encounter between the police and a private citizen results in a seizure, courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or "*Terry* stops," which must be supported by a reasonable, articulable suspicion of criminal activity under *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) encounters that involve no coercion or detention and, thus, do not implicate fourth amendment interests. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006).

¶ 22    The parties do not dispute that police were justified in first pulling parallel to defendant to question him as to the shot spotter alert. That was a consensual encounter not implicating the fourth amendment. See *People v. Murray*, 137 Ill. 2d 382, 391-93 (1990) (merely approaching and questioning a person seated in a parked vehicle does not constitute a seizure), *abrogated on other grounds by Luedemann*, 222 Ill. 2d 530. The parties, however, part ways in analyzing the remaining interaction. Defendant contends he was illegally seized the moment officers blocked in his car while activating their overhead emergency lights. Defendant maintains he was not committing a traffic violation and his "up-and-down movements," as well as the shot spotter alert, otherwise failed to provide the reasonable suspicion necessary to seize him, even for a brief investigative detention.

¶ 23    The State responds initially that defendant was *not* seized for purposes of the fourth amendment until officers requested that he exit his vehicle, at which point they had ample reasonable suspicion to support the seizure. The State maintains in the alternative that even

assuming police seized defendant at an earlier point, defendant's traffic violations justified the seizure. We agree with the State's latter argument.

¶ 24    Generally, stopping a vehicle based on a suspected violation of the law constitutes a seizure of a person under the fourth amendment, even if the stop is for a brief period and for a limited purpose. *People v. Gaytan*, 2015 IL 116223, ¶ 20; *People v. Close*, 238 Ill. 2d 497, 504 (2010). As such, a vehicle stop is subject to the fourth amendment's requirement of reasonableness, which we analyze in accordance with *Terry*. *People v. Henderson*, 2013 IL 114040, ¶ 25. Under *Terry*, police may conduct a brief, investigatory stop where the officer reasonably believes that the person has committed, or is about to commit, a crime, including a traffic violation. *Id.*; *Dunmire*, 2019 IL App (4th) 190316, ¶ 72. The investigatory stop must be justified at its inception, and the officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Close*, 238 Ill. 2d at 505. While the officer's suspicion must amount to more than an inarticulate hunch, it does not need to rise to the level of suspicion required for probable cause. *Id.* Yet, if reasonable suspicion is lacking, the traffic stop is unconstitutional and evidence obtained as a result of the stop is generally inadmissible. *Gaytan*, 2015 IL 116223, ¶ 20.

¶ 25    Further, for purposes of the fourth amendment, a person is seized when an officer, by means of physical force or show of authority, has in some way restrained the citizen's liberty. *Luedemann*, 222 Ill. 2d at 550. As to a person seated in a parked vehicle, the appropriate test is whether a reasonable person in the defendant's position would have believed he was free to decline the officer's requests or otherwise terminate the encounter. *Id.* at 550-51. The analysis thus requires an objective evaluation of the police conduct in question. *Id.* at 556-57. Indicative of a seizure are the so-called *Mendenhall* factors (see *United States v. Mendenhall*, 446 U.S. 544

(1980)), including the threatening presence of several police officers, the display of a weapon by an officer, some physical touching of the person, and the use of language or tone of voice indicating that compliance with the officer's request is required. *Murray*, 137 Ill. 2d at 390; *In re Tyreke H.*, 2017 IL App (1st) 170406, ¶ 32 (noting, the *Mendenhall* factors' importance but that they are not exhaustive). Additional factors supporting seizure of a parked vehicle include " 'boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority.' " *Luedemann*, 222 Ill. 2d at 557 (quoting 4 Wayne R. LaFave, Search & Seizure § 9.4(a), at 434-35 (4th ed. 2004)).

¶ 26     Here, Officer Farias testified that in the mid-to-later evening of June 15, 2017, he drove himself and Officer Ali in their marked police SUV to 5648 South Carpenter Street after receiving an electronic alert that gunshots had been fired in that area. Once there, they encountered defendant's running vehicle, with headlights on, stationed for no obvious reason some three to six feet off the curb. Officer Farias expressly testified that defendant's car was obstructing traffic. Officer Farias further testified that after pulling parallel to defendant and asking him about the possible shots fired, a consensual encounter, the police then decided to conduct a traffic stop due to a "traffic infraction" relating to how defendant's vehicle was parked off the curb. Officer Ali corroborated this testimony with his own. The officers thus referenced the Chicago Municipal Code, which provides that "[t]he operator of a vehicle shall not so operate the vehicle as to form an unreasonable obstruction to traffic." Chicago Municipal Code § 9-40-130 (added July 12, 1990). "Traffic" means "pedestrians, ridden or herded animals, bicycles, vehicles, and other conveyances either singly or together while using any public way for purposes of travel." Chicago Municipal Code § 9-4-010 (amended Nov. 26, 2019).

¶ 27    Contrary to defendant's contention otherwise, the evidence—including Officer Farias's testimony and the video footage—amply supports that defendant positioned his car in such a manner as to inspire the officers' reasonable suspicion that he was or could be violating the traffic obstruction section of the Municipal Code.[5] See *People v. Hackett*, 2012 IL 111781, ¶ 28 (noting that a police officer can effect a lawful *Terry* stop without first considering whether the observed circumstances would satisfy each element of a particular offense); *Close*, 238 Ill. 2d at 511 (noting, *Terry* does not require that the officer "know" that the driver is committing a crime). Indeed, "[p]olice officers are ' "not required to rule out all possibility of innocent behavior" ' before initiating a *Terry* stop." *Close*, 238 Ill. 2d at 511 (quoting 4 Wayne R. LaFave, Search & Seizure § 9.5(b), at 481 (4th ed. 2004)). As Officer Farias testified, the video itself shows a southbound vehicle forced to veer into the northbound lane in order to avoid defendant's vehicle. Defendant nonetheless points out that there was little traffic, and this shows defendant's car was not unreasonably obstructive under the ordinance. He also asserts it was the police who were

_____

[5]The parties also dispute whether officers had reasonable suspicion to support the traffic stop based on section 9-76-090 of the Municipal Code (Chicago Municipal Code § 9-76-090 (added July 12, 1990)), relating to the lighting conditions of parked vehicles. As applied to the circumstances of this case, that section states that when a vehicle is lawfully parked at nighttime on a lighted residential street, it is not required to display its lights; however, a vehicle parked on an unlighted street around the time of dusk or dawn must have dim lights visible in the vehicle's front and back by 500 feet. When testifying, Officer Ali conceded that this section did not apply because defendant's car was not "parked" as defined by the Municipal Code, since it was occupied. See Chicago Municipal Code § 9-4-010 (amended Nov. 26, 2019) (noting, parking "means the standing of an unoccupied vehicle otherwise than temporarily for the purpose of and while actually engaged in loading or unloading property or passengers"). While defendant argues that section 9-76-090 patently failed to provide the reasonable suspicion needed to support the stop, the State argues that it does apply. We fail to see how this ordinance applies for multiple reasons, but these arguments are much ado about nothing given both Officer Ali's later clarification and Officer Farias's testimony that defendant was violating the obstruction of traffic ordinance. In addition, notably, Officer Ali was defendant's witness at the motion to suppress hearing, while Officer Farias was the State's witness. To the extent defendant fulfilled his burden of proving the traffic stop illegal, the State adequately countered that showing with Officer Farias's solid testimony about the vehicle obstruction. See *Dunmire*, 2019 IL App (4th) 190316, ¶ 34 (noting, if the defendant makes a *prima facie* showing that the evidence was obtained through an illegal search or seizure, the burden then shifts to the State, which must present evidence to counter that *prima facie* showing).

obstructing the aforementioned driver due to where they stood and how their squad car was angled in front of defendant's vehicle. We note that the trial court found defendant's car was far from the curb, a factual finding that was not against the manifest weight of the evidence. And, even crediting defendant's characterizations as to the police, we note that but for defendant's presence, there would be no obstruction of any kind. Likewise, these arguments do not preclude the conclusion that defendant's car *could be* unreasonably obstructive, which is all that's required under *Terry*. See *Henderson*, 2013 IL 114040, ¶ 25 (noting that police may conduct a brief, investigatory stop where the officer reasonably believes that the person has committed, or *is about to*, commit a crime); *People v. Price*, 2011 IL App (4th) 110272, ¶ 28 (noting that the trial court's focus is not on whether an offense was actually committed, but rather on the officer's reasonable suspicion); *cf. People v. Isaac*, 335 Ill. App. 3d 129, 132 (2002) (holding that the defendant did not violate a Vehicle Code statute that prohibited people from driving at such a slow speed as to impede traffic, where the defendant was going 30mph in a 40mph-zone and other cars could lawfully go around hers in the double-westbound lane). The evidence supports an investigatory stop allowing officers to inquire further into the reason for defendant's particular stationing of his vehicle, which the officers did. See *id.*

¶ 28    We thus find that defendant was seized within the meaning of the fourth amendment when police turned on the vehicle's rotating lights, blocked defendant's vehicle from moving forward, and then approached his vehicle on either side with flashlights, and when Officer Ali specifically requested that defendant show his hands. See *Luedemann*, 222 Ill. 2d at 557; see also *People v. Gomez*, 2018 IL App (1st) 150605, ¶ 27 (and cases cited therein; noting that the positioning of the officers around a vehicle, coupled with orders for the occupants to put their hands up and exit, constituted a show of force and authority and thus a seizure). In objectively

analyzing the police conduct at hand, we do not believe a reasonable person in the defendant's position would have believed he was free to terminate the encounter. See *Luedemann*, 222 Ill. 2d at 550-51, 556-57. This conclusion is buttressed by Officer Farias's statement that when he turned on his emergency lights and then pulled his police SUV in front of defendant's car, he was blocking defendant's car, and defendant was not at that time free to leave. Thus, contrary to the trial court's determination, in our *de novo* review, we find a *Terry* stop occurred at the very latest when Officer Ali ordered defendant's hands in the air.

¶ 29    Such a seizure, however, was justified as reasonable, not just by the traffic stop, but by the suspicious arm movements that defendant made when the officers initially approached defendant. See *People v. Ruppel*, 303 Ill. App. 3d 885, 890 (1999) (noting that a furtive gesture when considered with other circumstances may be sufficient to support probable cause, or as in our case, reasonable suspicion). While officer Ali testified that defendant made the arm movement as Officer Farias backed up the police SUV, Officer Farias testified that defendant made the movement just prior. In either case, defendant made the movement before his seizure by police. Regardless of whether defendant was a mere witness to the shot spotter event, the suspicious movement also inspired the officers' fear for their own safety. All these factors supported the officers' decision to further investigate the circumstances so they could confirm or dispel their suspicions, which is the very essence of a *Terry* stop. See *Close*, 238 Ill. 2d at 512. We also note that even assuming the officers' ultimate aim was to further investigate the shot spotter and/or furtive movements, pretextual stops are permissible so long as a reasonable suspicion of a traffic violation exists. See *Dunmire*, 2019 IL App (4th) 190316, ¶ 49.

¶ 30    As the officers further investigated both the traffic infraction and suspicious arm movement, it became quite clear that defendant was both harboring a gun under his seat and

attempting to hide this fact from officers. In support of this conclusion, we note that defendant had a FOID card in his wallet and nervous hands. Just after Officer Ali's show-of-hands order, defendant made "a sliding motion from his legs towards the bottom of his seat," as though he were dragging his feet down under the seat. He in fact did have a holster sticking out from under his driver's seat. When asked why, he responded, "I don't know." Officer Ali asked defendant what he was reaching for when the officers approached his vehicle in their own, and defendant responded that it was his phone, which was contradicted by his furtive movements and also Officer Ali's observance of his phone resting on the car's center console. Within a short period, all these facts provided officers with reason to further seize defendant and search his car, where they found the gun readily accessible under his driver's seat, in spite of the absence of a conceal and carry license. The touchstone of the fourth amendment is reasonableness, which is measured objectively by examining the totality of the circumstances surrounding a police officer's encounter with a citizen. The officers' actions in this case were nothing but reasonable. See *id.* ¶ 39.

¶ 31    Based on the foregoing, we cannot say that the trial court was incorrect in deciding the ultimate issue of denying defendant's motion to suppress, as there was reasonable suspicion justifying the vehicle stop at the outset. See *Gaytan*, 2015 IL 116223, ¶ 18.

¶ 32                          III. CONCLUSION

¶ 33    We thus affirm the judgment of the trial court in denying defendant's motion to suppress and defendant's subsequent conviction.

¶ 34    Affirmed.

---

**No. 1-18-2245**

---

| | |
|---|---|
| **Cite as:** | *People v. Edwards*, 2020 IL App (1st) 182245 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-9951; the Hon. Arthur F. Hill Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Anna C. Carlozzi, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Tasha-Marie Kelly, and Kellie Van Voorhis, Assistant State's Attorneys, of counsel), for the People. |

---