2023 IL App (1st) 211240-U

No. 1-21-1240

March 21, 2023

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 2043 |
| | ) | |
| VANLIER EDWARDS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:  The detectives had reasonable, articulable suspicion that criminal activity was afoot to stop defendant and probable cause to arrest him upon observing narcotics in plain view.

¶ 2    Following a jury trial, defendant Vanlier Edwards was found guilty of armed habitual criminal (AHC), unlawful use or possession of a weapon by a felon (UUWF), and possession of heroin. The trial court merged the UUWF count with the AHC count and sentenced defendant to 8½ years in prison for AHC and 3 years in prison for possession of heroin, to be served

concurrently. On appeal, defendant argues the trial court erred in denying his motion to quash arrest and suppress evidence because the arresting police detectives lacked reasonable, articulable suspicion or probable cause to seize and arrest him based on an unregistered confidential informant's tip without having demonstrated the tipster's proven reliability. We affirm.

¶ 3      Defendant was charged by indictment with armed violence, AHC, unlawful use or possession of a weapon by a felon, aggravated unlawful use of a weapon, violating the Firearm Owner's Identification (FOID) Card Act, possession of heroin with intent to deliver, and possession of cocaine, all premised on an incident in Chicago on January 8, 2018. The State proceeded to trial on an amended count of possession of heroin (720 ILCS 570/401(c)(1) (West 2018)) and one count each of AHC (720 ILCS 5/24-1.7(a) (West 2018)), UUWF (720 ILCS 5/24-1.1(a) (West 2018)), and possession of cocaine (720 ILCS 570/402(c) (West 2018)). The State nol-prossed the remaining counts.

¶ 4      Prior to trial, defendant filed a motion to quash arrest and suppress "the gun, the drugs and the statement" he made at the scene regarding his possession of the firearm.[1] The trial court held a hearing on the motion and the following testimony was adduced.

¶ 5      Defendant called Chicago police detective Andrew Kemps, who testified that on January 8, 2018, at about 1:30 p.m., he and his partner, Detective Donald Lupo, were assigned to a gang enforcement team and on patrol in a police vehicle. Lupo drove the vehicle and Kemps sat in the

---

[1] The motion to suppress is not included in the record on appeal. In his opening brief, defendant acknowledges that he has been unsuccessful in obtaining a copy of the motion. Defendant, as the appellant, bears the burden of providing this court with "a complete record sufficient to support his claims of error." *People v. Lopez*, 229 Ill. 2d 322, 344 (2008). "[A]ny doubts that arise from the incompleteness of the record will be resolved against [defendant]." *Id.* Although the motion is not included in the record, the report of proceedings from the hearing on the motion is included in the record.

passenger's seat. Kemps received information from "[his] confidential informant" about a white Chrysler Sebring parked in an alley near the 3000 block of West Jackson Boulevard and a "black" man wearing a "black hoodie" in the passenger's seat selling heroin. The confidential informant was neither registered nor a John Doe affiant on a search warrant. Kemps would have looked up the informant and known his date of birth, but could not recall the information at the time of the hearing.

¶ 6    Kemps testified that as Lupo turned their vehicle into the alley near the 3000 block of West Jackson Boulevard, Kemps "[i]mmediately" observed the side of a white Sebring from about 50 feet. The Sebring's side windows were tinted. As Lupo drove closer, Kemps saw the front and passenger's sides of the Sebring and two occupants inside, but he could not see their hands. Lupo stopped their vehicle "more or less" in front of the Sebring. Kemps and Lupo did not conduct any surveillance prior to approaching the Sebring. Kemps exited the vehicle and ran toward the Sebring's passenger's side. Kemps never drew his weapon, but he noticed Lupo's weapon was drawn once Kemps reached the Sebring's front passenger's side window, which was rolled up.

¶ 7    At the front passenger's side window, Kemps ordered the occupants, one of whom was defendant, to show their hands. Defendant was "almost fully" reclined in his seat and put his hands up. By the time Kemps got to the window, he had already observed on defendant's chest a clear plastic bag, which held nine purple-tinted bags containing a "white powder substance, suspect heroin." Kemps opened the door, recovered the bags containing the suspect narcotics, and handcuffed defendant, who was compliant. Before Mirandizing defendant, Kemps asked him if he had anything else on him, and defendant replied that he had a firearm in his waistband. Kemps did

not have a search or arrest warrant for defendant, and defendant did not consent to a search. Kemps did not have a body-worn camera and the police vehicle was not equipped with a camera.

¶ 8 On cross-examination, Kemps testified that he and Lupo were wearing plain clothes in an unmarked Chevrolet Tahoe, and the Tahoe's lights had not been activated. The Sebring was backed up to a building, no lights were on, and the engine was not running. The Sebring was parked in a residential area known for "high narcotic sales." Kemps had made about "a dozen" narcotic arrests in that area, and the narcotic sales "primarily" took place in the alley where the Sebring was parked, as well as another nearby alley. When Kemps exited the vehicle and looked through the passenger's side window, he saw the purple baggies that stood out against defendant's black hoodie. Based on "previous dealings on that block," Kemps "knew immediately" the purple baggies contained suspect heroin because he knew "that is the color of the bags that that particular narcotics spot uses to distinguish their product from other products in the area." Kemps testified "[t]here was no question what it was."

¶ 9 Lupo's testimony regarding the encounter with defendant was substantially similar to Kemp's testimony. He added that he knew the informant's "birth name," but did not know the informant's date of birth or address. The informant told the detectives over the phone that "somebody was selling narcotics and was armed with a pistol *** at the location in question." Kemps and Lupo had seen the Sebring parked in the alley "earlier in the day," as they had "been in the vicinity" of the alley "multiple times" that day.

¶ 10 As Lupo drove to the Sebring in the alley, he observed that the Sebring was "illegally parked in a vacant lot," but the detectives did not issue a citation. Due to the angle from which they approached and the Sebring's tinted side windows, Lupo could not see the Sebring's

occupants as his vehicle turned into the alley. However, the front of the Sebring was in Lupo's line of sight once he drove up to it. Lupo parked the unmarked police vehicle "slightly to the west" of the Sebring. Lupo never lost sight of the occupants once he noticed them.

¶ 11    Lupo exited the police vehicle and approached the Sebring "with purpose, expediency." He testified that he approaches "every vehicle" with purpose because he is mindful of his safety. Lupo drew his weapon, "immediately" gave "verbal direction to show me their hands," and the occupants "immediately complied." "Within seconds" of exiting his vehicle, Lupo observed the "baggies" resting on defendant through the Sebring's front windshield. Lupo acted as the "guard officer" observing the vehicle and its occupants while Kemps acted as the "business officer" approaching the vehicle for further investigation. Kemps approached the passenger's side of the Sebring, ordered defendant out of the Sebring, and handcuffed him.

¶ 12    In closing argument, defendant argued that the detectives lacked probable cause when they conducted a "full blown arrest from the moment the officers jump[ed] out" of their vehicle. Defendant claimed that his movement was restrained because Lupo had his weapon drawn and ordered him to show his hands, so he was not free to leave at the expense of "possibly being shot." Defendant also argued that "all of this happened based on a tip," which was not from a registered confidential informant with a track record of providing credible information. Rather, the tip was corroborated only by "two innocuous details": the color of a vehicle and its location parked in an alley. He argued the informant did not provide "any predictive information" of what would happen in the future, there were no "exigent circumstances," no "claim of violence," no "ongoing emergency," no surveillance conducted, and the information provided by the tipster was insufficient for probable cause.

¶ 13    The State argued that the confidential informant's tip "doesn't matter," as the detectives were allowed to "approach anybody that they want to on the street." When they did so, the detectives saw the narcotics in plain view.

¶ 14    The trial court denied defendant's motion, finding the confidential informant was a "nonissue" because the detectives were allowed to approach the Sebring as they did even without the informant's information. Upon doing so, they saw the narcotics in "plain view" on defendant's body and were allowed to arrest defendant "right then." The court did not find that defendant was arrested just because Lupo had a firearm drawn, as defendant was still sitting in his vehicle and had not been handcuffed. The court explained that the detectives knew from experience that the purple bags contained narcotics, and the detectives placed defendant under arrest once they saw narcotics on his chest and handcuffed him. The court explicitly found that the arrest took place "after they see the narcotics."

¶ 15    At trial, Kemps testified consistently with his testimony at the suppression hearing. He added that, at the time of arrest, he and Lupo wore a bullet-proof vest that displayed their name and star insignia, and they were on patrol focusing on "gangs and drugs." When Lupo stopped their vehicle in the alley, Kemps exited and approached the passenger's side of the Sebring at a "quick pace" that was "closer to a jog" than a "full-out run." Looking through the front passenger's side window, Kemps observed defendant wearing a black hooded sweatshirt and reclined at about 45 degrees in his seat. Defendant had bags of narcotics on the center of his chest. He had his hands "up," but then motioned them down toward the floor "for a second." The detectives gave "verbal direction" for defendant to "[p]ut [his] hands up," and defendant complied.

¶ 16    Kemps opened the front passenger's side door, handcuffed defendant, and recovered the bags of suspect heroin. Kemps asked defendant "if he had anything else on him," and defendant responded that "he had a handgun in his waistband." Kemps immediately recovered the firearm, a .9-millimeter firearm loaded with 15 live rounds, from defendant's waistband. While still handcuffed, Kemps directed defendant out of the vehicle. In the middle of defendant's seat, Kemps observed a clear sandwich bag with a clear knotted bag inside of it containing a "white rock-like substance" suspected to be crack cocaine. The firearm and bags of suspect heroin and crack cocaine were recovered and inventoried.

¶ 17    Kemps testified that prior to the day of arrest, he did not know defendant and never had contact with him. Kemps handcuffed defendant in "less than 10 seconds and maybe less than five seconds" after seeing the bags of suspect heroin.

¶ 18    On cross-examination, Kemps testified that Lupo drove the police vehicle about 50 feet down the alley before reaching the Sebring. Kemps interacted with defendant and Lupo interacted with the driver. Kemps focused his attention on defendant, but believed the driver of the Sebring was also in a reclined position in the vehicle.

¶ 19    Lupo testified consistently with his testimony at the suppression hearing. He reiterated that as he drove down the alley, he observed the Sebring "parked illegally" in a vacant lot perpendicular to the building behind it. He described the police vehicle as "a big SUV" and from his "elevated position" in the vehicle, he "was staring dead on directly through the front windshield" of the Sebring. As Lupo approached the vehicle on foot, he saw defendant, wearing a black hoody, reclined in the passenger seat "laying almost parallel" to the vehicle. Lupo reiterated that he "saw the narcotics" on defendant. Kemps handcuffed defendant and told Lupo, "gun, gun, gun,"

indicating "there was a firearm in the car." Kemps recovered the firearm from defendant's waistband.

¶ 20    On cross-examination, Lupo testified that the Sebring was parked about 100 feet from the mouth of the alley and "never moved." As he drove toward the Sebring, he did not notice "any substantial movement" inside the Sebring. The vehicle's driver was seated in a similar fashion as defendant. Lupo drew his firearm within "seconds" of exiting the police vehicle and before he heard Kemps yell, "gun, gun." After exiting the police vehicle, Lupo stood "[i]nches" from the front of the Sebring. He "yelled show me your hands," and the Sebring's two occupants complied. When defendant "went down quick to his waist," Lupo said, "let me see your hands," "[o]ver and over again" until defendant complied.

¶ 21    The State read a stipulation that defendant had previously been convicted of two qualifying felony offenses for purposes of the AHC count, and a felony offense for purposes of the unlawful possession of a weapon by a felon count. The State also read a stipulation that, if called, an Illinois State Police chemist would testify that the nine bags within the larger bag contained 3.4 grams of heroin, and the other inventoried bag contained less than 0.1 gram of cocaine.

¶ 22    The jury found defendant guilty of AHC, unlawful possession of a weapon by a felon, and possession of heroin but acquitted him of possession of cocaine.

¶ 23    Defendant filed a motion for new trial and three supplemental motions for new trial. In relevant part, the third supplemental motion alleged that the trial court erred in denying his motion to quash arrest and suppress evidence. At a hearing on the motion, defendant argued the detectives did not have sufficient information to arrest him, and the detectives had approached him based on an informant who was not "registered."

¶ 24    After hearing arguments, the trial court denied defendant's motion for new trial. It found, in relevant part, that the informant "add[ed] nothing" to the case because the police could have entered the alley "for no reason" and the narcotics were observed in plain view on defendant's chest.

¶ 25    The trial court merged defendant's unlawful possession of weapon by a felon count into the AHC count, and sentenced defendant to concurrent prison terms of 8½ years for AHC and 3 years for possession of heroin.

¶ 26    On appeal, defendant challenges the trial court's denial of his motion to suppress evidence, alleging the detectives lacked reasonable, articulable suspicion or probable cause to arrest him based on an unregistered and uncorroborated confidential informant's tip. He argues the firearm, the heroin, and his statement should be suppressed as a result of the illegal arrest, and his convictions therefore should be reversed.

¶ 27    A defendant filing a motion to suppress evidence bears the burden of making a "*prima facie* case that the evidence was obtained by an illegal search or seizure." *People v. Brooks*, 2017 IL 121413, ¶ 22. When reviewing a trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under that standard, we review the trial court's findings of historical fact for clear error, giving "great deference" to the court's factual findings and reversing them only if against the manifest weight of evidence, but we review *de novo* the court's ultimate legal determination on whether suppression is warranted. *Id.* We may consider evidence adduced in both the suppression hearing and at trial. *People v. Hood*, 2019 IL App (1st) 162194, ¶ 39.

¶ 28 The fourth amendment of the United States Constitution and the Illinois Constitution guarantee the "right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). However, " '[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, *** certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). Courts have categorized police-citizen encounters into three tiers: (1) the arrest of a citizen, which must be supported by probable cause; (2) a "temporary investigative seizure," or *Terry* stop, conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) a consensual encounter, which involves "no coercion or detention" and thus implicates no fourth amendment interests. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010).

¶ 29 "For purposes of the fourth amendment, an individual is seized when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *Luedemann*, 222 Ill. 2d at 550. "Generally, stopping a vehicle based on a suspected violation of the law constitutes a seizure, even if the stop is for a brief period and for a limited purpose." *People v. Gaytan*, 2015 IL 116223, ¶ 20. In situations where a "person's freedom of movement is restrained by some factor independent of police conduct," such as being seated inside a parked vehicle, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." (Internal quotation marks omitted.) *Luedemann*, 222 Ill. 2d at 550-51. This test assumes "a reasonable *innocent*

person" and requires "an objective evaluation of the police conduct in question." (Emphasis in original.) *Id.* at 551. "[T]he general rule [is] that the police may approach and question a person seated in a parked vehicle without that encounter being labeled a seizure." *Id.* at 552. Any such encounter becomes a seizure "only if the officer, through physical force or a show of authority, restrains the liberty of the vehicle's occupant." *Id.* at 552-53. Factors indicating seizure of a parked vehicle include "boxing the car in," "pointing a gun at the suspect and ordering him to place his hands on the steering wheel," or "use of flashing lights as a show of authority." (Internal quotation marks omitted.) *Id.* at 557.

¶ 30    Here, it is uncontroverted that a seizure occurred when the detectives boxed the Sebring in by parking their police vehicle in front of the Sebring. See *id.* at 560 (recognizing that "the courts have for years found that blocking cars in their parking spots is coercive"). Thus, our inquiry necessarily turns to whether the seizure was reasonable under the circumstances presented, "as only those seizures which are 'unreasonable' violate the fourth amendment." *People v. Gherna*, 203 Ill. 2d 165, 181 (2003).

¶ 31    As we have noted, one type of encounter between the police and citizens involves a temporary investigative stop conducted under the standards set forth by the United States Supreme Court in *Terry*. Under *Terry*, " 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ***,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 30). In order to properly conduct a *Terry* stop, "[t]he officer must have a reasonable, articulable suspicion that criminal activity is afoot." (Internal quotation marks omitted.) *People v.*

*Timmsen*, 2016 IL 118181, ¶ 9. "Reasonable suspicion is a low bar." (Internal quotation marks omitted.) *People v. Lozano*, 2022 IL App (1st) 182170, ¶ 33. Nonetheless, though this standard is "less demanding" than the probable cause standard, "an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted.) *Timmsen*, 2016 IL 118181, ¶ 9. "A police officer must be able to point to specific articulable facts which justify the intrusion on the suspect's liberty." *People v. Sims*, 2014 IL App (1st) 121306, ¶ 9. Where a reasonable suspicion is lacking, "the traffic stop is unconstitutional and evidence obtained as a result of the stop is generally inadmissible." *People v. Edwards*, 2020 IL App (1st) 182245, ¶ 24.

¶ 32     The decision to make an investigatory stop is based on the totality of the circumstances. *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14. "The investigatory stop must be justified at its inception, and the officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Edwards*, 2020 IL App (1st) 182245, ¶ 24 (citing *People v. Close*, 238 Ill. 2d 497, 505 (2010)). A finding of "reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and due weight must be given to the reasonable inferences the officer is entitled to draw from the facts in light of his experience." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 19. "The principles of *Terry* apply in full force to stops or detentions of vehicles." *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 53.

¶ 33     We find the detectives initiated a reasonable and justified *Terry* stop when they boxed in the Sebring. Upon entering the alley, the detectives found the Sebring "illegally parked" in a vacant lot in an alley, with its engine and lights off, and two occupants inside, both reclined in their seats.

The alley was in a residential area known for "high narcotic sales," and, more specifically, narcotic sales "primarily" took place in the alley. In fact, Kemps had made about "a dozen" narcotics-related arrests in that very area. While on patrol in the alley's vicinity, the detectives had seen the Sebring parked in the same alley earlier that day. When the officers returned to the alley pursuant to the informant's information, they saw the vehicle was still parked in the alley.

¶ 34    Based on the totality of these circumstances, the detectives certainly had sufficient information to reasonably suspect that criminal activity may be afoot, thus justifying a brief, investigatory stop of defendant. See *Hood*, 2019 IL App (1st) 162194, ¶ 63 (the defendant's presence in a "high narcotics area" is a factor that may be considered along with others to determine whether an officer had reasonable suspicion to stop the defendant). Indeed, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *People v. Carter*, 2021 IL 125954, ¶ 34. Thus, the detectives here were "not required to rule out all possibility of innocent behavior" before conducting the stop. (Internal quotation marks omitted.) *Close*, 238 Ill. 2d at 511.

¶ 35    In conducting the *Terry* stop, the detectives exited the police vehicle and approached the parked Sebring on foot. "Within seconds" of exiting their vehicle, they observed defendant reclining in the passenger's seat with plastic bags containing a white powder-like substance on his torso in plain view. Based on his experience, Kemps "knew immediately" the plastic baggies contained suspect narcotics based on their purple tint. At that point, the detectives had probable cause to conduct an arrest by handcuffing defendant and seizing the narcotics, as they had "knowledge of facts and circumstances" that were "sufficient to justify a reasonable person to

believe" that defendant was committing a crime. *Jones*, 215 Ill. at 273-74; see *People v. Surles*, 2011 IL App (1st) 100068, ¶¶ 26-28 (the defendant was arrested once he was ordered out of the vehicle and handcuffed). The detectives' actions in this case were nothing but reasonable.

¶ 36    Defendant also argues that the detectives lacked reasonable suspicion to stop defendant based on the uncorroborated informant's tip, which did not have adequate indicia of reliability. See *People v. Chavez*, 327 Ill. App. 3d 18, 32 (2001) (When determining whether an informant's statement provides sufficient basis for a *Terry* stop, we should consider "the informant's veracity, reliability, and basis of knowledge." (Internal quotation marks omitted.)).

¶ 37    In *People v. Carter*, 2021 IL 125954, ¶¶ 25, 28, our supreme court found that even an anonymous tip may be found reliable under certain circumstances, where the tip has a "strong level of detail and corroboration." Here, the informant had relayed information that a black man wearing a black hoodie was seated in the passenger seat of a white Sebring parked in a particular alley on the 3000 block of Jackson, had a firearm, and was selling heroin. The informant provided a strong level of detail and detectives were able to corroborate some of those details before deciding to perform the *Terry* stop, specifically the location and model of the vehicle. Moreover, we note that the detectives indicated they knew the informant's name and date of birth at the time that they received the information, although they were not able to recall the information at trial. Therefore, they had not received the tip from a completely anonymous source, but rather someone whose identity they could verify. *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 19 ("[T]here is a difference between an anonymous tip and one from a known informant whose reputation can be ascertained and who can be held accountable if a tip turns out to be fabricated.") (discussing *Florida v. J.L.*, 529 U.S. 266 (2000)).

¶ 38    However, even if the informant was unreliable, we find no fourth amendment violation occurred. The only action the detectives took based solely on the informant's information was returning to the alley, in the "high narcotics sales" area that they were already patrolling. Only "when the reliability of the information obtained from an anonymous tip cannot be readily corroborated *and there are no other suspicious circumstances known to the officer*" will a stop be deemed unjustified. (Emphasis added.) *People v. Scott*, 249 Ill. App. 3d 597, 602 (1993). Here there were ample "other suspicious circumstances known to the officer[s]" warranting further investigation of the Sebring.

¶ 39    As we have found, by the time the detectives received the tip, they had already observed the Sebring parked in the alley in a "high narcotics sales" area. When they returned to the alley, the Sebring was still illegally parked in the same alley, with two occupants seated in the front and the vehicle's engine and lights off, providing the detectives with a reasonable suspicion that criminal activity was afoot to warrant an investigatory stop regardless of whether they received a tip.

¶ 40    Nonetheless, defendant argues the initial encounter was an arrest because Detective Lupo rapidly approached the Sebring with a firearm drawn and the detectives "yelled" at defendant and the Sebring's driver to show their hands.

¶ 41    An arrest occurs when a person's freedom of movement is restrained by physical force or a show of authority. *People v. Washington,* 363 Ill. App. 3d 13, 23 (2006). "During the course of an investigatory stop, a person is no more free to leave than if he were placed under a full arrest." (Internal quotation marks omitted.) *People v. Moore*, 378 Ill. App. 3d 41, 46 (2007). "Thus, mere restraint does not turn an investigatory stop into an arrest." *People v. Maxey*, 2011 IL App (1st)

100011, ¶ 60. "Rather, an arrest is distinguishable from an investigatory stop based on the length of detention and the scope of the investigation following the initial stop." *Id.* "[A] restriction of movement that is brief may amount to an arrest rather than a *Terry* stop if it is accompanied by use of force usually associated with an arrest, unless such use of force was reasonable in light of the circumstances surrounding the stop." (Internal quotation marks omitted.) *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 38. The "status or nature" of an investigatory stop is not affected by "the drawing of a gun by the police officer." *People v. Ross*, 317 Ill. App. 3d 26, 32 (2000).

¶ 42    In support of his position that he was arrested upon the initial encounter with the detectives, defendant relies on the so-called *Mendenhall* factors (see *United States v. Mendenhall*, 446 U.S. 544 (1980)), which include "(1) the threatening presence of several police officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests." *People v. Almond*, 2015 IL 113817, ¶ 57. He claims that aside from the physical touching, the other *Mendenhall* factors were present during the encounter to establish he was arrested. However, the *Mendenhall* factors are not used to determine that a seizure was necessarily an arrest. See *Mendenhall*, 446 U.S. at 554; *Almond*, 2015 IL 113817, ¶ 57, 64 (applying the *Mendenhall* factors to determine whether a police encounter was consensual or a seizure); *Edwards*, 2020 IL App (1st) 182245, ¶ 25 ("Indicative of a seizure are the so-called *Mendenhall* factors.").

¶ 43    The fact that Lupo had a firearm drawn as the detectives rapidly approached the Sebring and ordered a show of hands did not transform the investigatory stop justified under *Terry* into an arrest. We find the drawing of a firearm and ordering to see defendant's hands were reasonable in light of the circumstances (*Daniel*, 2013 IL App (1st) 111876, ¶ 38) and did not affect the "status

or nature" of the investigatory stop to transform it into an arrest (*Ross*, 317 Ill. App. 3d at 32). See *People v. Washington*, 205 Ill. App. 3d 452, 456-57 (1990) (officers' firearm being drawn did not convert the stop into an arrest, where the officers had knowledge that the defendant had a firearm in the trunk of a vehicle the defendant was standing near).The detectives had been patrolling the area for gang- and narcotics-related activity and had "noticed" the Sebring parked in the same alley, known for narcotics sales, "earlier in the day." When conducting the stop of the parked vehicle, they had observed that the Sebring's lights and engine were off, and two occupants were inside. Given these peculiar circumstances, the detectives had reason to suspect their safety may be at risk and that safety precautions were necessary before investigating further. See *People v. Bujdud*, 177 Ill. App. 3d 396, 403 (1988) (Law enforcement officers "are not required to risk their safety by assuming that a suspect will submit peacefully to questioning.").

¶ 44 Moreover, the detectives' testimonies established that this initial encounter was brief, lasting a matter of seconds before probable cause arose when the officers saw the suspected heroin, and only involved two detectives, with one detective approaching defendant as the "business" officer and the other detective standing at the front of the vehicle as the "guard" officer. See *Maxey*, 2011 IL App (1st) 100011, ¶¶ 61-64 (*Terry* stop did not transform into an arrest where the "brief detention" of the defendant was less than 15 minutes long). As defendant acknowledges, the detectives made no physical contact with defendant during this initial encounter and only made physical contact to handcuff him after the baggies with suspect narcotics were observed in plain view. Given the limited duration and scope of the detectives' initial approach toward defendant, we find the stop did not transform into an arrest until the detectives had handcuffed defendant and removed him from the vehicle, after having gathered enough information to support probable cause

to arrest premised on the narcotics in plain view on his chest. *Maxey*, 2011 IL App (1st) 100011, ¶ 60; see also *Washington,* 363 Ill. App. 3d at 24 (noting that the "time, place, length, mood, and mode of the encounter" are relevant considerations in determining whether a defendant has been arrested). Importantly, defendant does not dispute that the detectives had probable cause to arrest when they observed the bags of suspect heroin on his chest.

¶ 45    While conducting their stop, the detectives soon after had probable cause to arrest defendant when they observed in plain view the multiple bags of white powder-like substance on defendant's chest, which they knew contained suspect heroin. *Jones*, 215 Ill. 2d at 273-74 ("Probable cause exists where the arresting officer has knowledge of facts and circumstances that are sufficient to justify a reasonable person to believe that the defendant has committed or is committing a crime."). Kemps then arrested defendant by handcuffing him and removing him from his vehicle.

¶ 46    We conclude that no fourth amendment violation occurred, and the trial court properly denied defendant's motion to suppress evidence.

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48    Affirmed.